AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri

In the Matter of
*(Briefly describe the property to be searched
or identify the person by name and address)*

the Use of a Cell-Site Simulator to Identify the Cellular
Device(s) Used by DEMETRIUS JOHNSON.

Case No. 4:18 MJ 7022 SPM

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

the Use of a Cell-Site Simulator to Identify the Cellular Device(s) Used by DEMETRIUS JOHNSON,

located in the     Eastern     District of     Missouri    , there is now concealed *(identify the person or describe the property to be seized)*:

see "Attachment A."

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, U.S.C., Sections 841(a)(1) and 846 | conspiracy to distribute controlled substances |

The application is based on these facts:
see attached APPLICATION, and AFFIDAVIT IN SUPPORT OF APPLICATION, FOR A WARRANT TO AUTHORIZE USE OF A CELL-SITE SIMULATOR TO IDENTIFY THE CELLULAR DEVICE(S). I certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by [investigative agency(ies)].

☑ Continued on the attached sheet.

☑ Delayed notice of  180  days (give exact ending date if more than 30 days:  08/07/2018 ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Federal Officer Michael W. Betz
FBI

*Printed name and title*

Sworn to before me and signed in my presence.

Date:    2.7.2018

City and state:   St. Louis, Missouri

*Judge's signature*

Honorable Shirley P. Mensah, U.S. Magistrate Judge

*Printed name and title*

AUSA: Angie E. Danis

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

IN THE MATTER OF THE APPLICATION )
OF THE UNITED STATES OF AMERICA )    No. 4:18 MJ 7022 SPM
FOR A WARRANT TO AUTHORIZE USE OF )
A CELL-SITE SIMULATOR TO IDENTIFY )    **FILED UNDER SEAL**
THE CELLULAR DEVICE(S) USED BY )
**DEMETRIUS JOHNSON.** )

### APPLICATION FOR A WARRANT TO AUTHORIZE USE OF A CELL-SITE SIMULATOR TO IDENTIFY CELLULAR DEVICE(S)

COMES NOW the United States of America, by and through its attorneys, Jeffrey B. Jensen, United States Attorney for the Eastern District of Missouri, and Angie E. Danis, Special Assistant United States Attorney for said District, and hereby makes application to this Court for a warrant, pursuant to Federal Rule of Criminal Procedure 41, and Title 18, United States Code, Section 3123, authorizing agents/officers of the Federal Bureau of Investigation and other authorized federal/state/local law enforcement agencies (hereinafter referred to as "investigative agency(ies)") to employ an electronic surveillance technique, that being a cell-site simulator (hereinafter "cell-site simulator") to identify the cellular device(s) used by:

**DEMETRIUS JOHNSON (DOB: 5/23/1994; SSN: XXX-XX-8920)** (hereinafter the "**target subject**").

### Introduction

1.      The undersigned applicant for the Government is a Special Assistant United States Attorney in the Office of the United States Attorney for the Eastern District of Missouri, and an "attorney for the Government," as defined in Fed. R. Crim. P. 1(b)(1)(B). Therefore, pursuant to Title 18, United States Code, Sections 3122(a)(1) and 3127(5), the undersigned may apply for a

Warrant authorizing a pen register and the disclosure of the telecommunication records and information as requested herein.

2.     Because collecting the information authorized by the Warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," the Warrant is designed to comply with the Pen Register Statute as well as Rule 41. See 18 U.S.C. §§ 3121-3127(3) & (4). Therefore, the Application and Warrant include all the information required to be included in a pen register order. See 18 U.S.C. § 3123(b)(1). The information obtained through the use of a cell-site simulator does not include the contents of any communication.

3.     Based on the facts set forth in the attached Affidavit, which is incorporated herein by reference, there is probable cause to believe that violations of Title 21, United States Code, Section(s) 841(a)(1) and 846 (hereinafter the "subject offense(s)") have been committed, are being committed, and will be committed by the **target subject**, as well as others known and unknown (hereinafter the "**target subject**(s)"). There is also probable cause to believe that identifying the cellular device(s) used by the **target subject** will lead to evidence of the subject offense(s), including the identification of individuals who are engaged in the commission of these offenses and identifying locations where the **target subject**s engage in criminal activity; and, that the cellular device(s) used by the **target subject** is being used in connection with the commission of the subject offense(s).

4.     The Government makes this Application for a Warrant under Federal Rule of Criminal Procedure 41 and Title 18, United States Code, Section 3123 upon a showing of probable cause. Attached to this Application and incorporated by reference as if fully set out herein is the Affidavit of Special Federal Officer Michael W. Betz, which alleges facts in order to show that there is probable cause to believe that the information associated with the **target subject** and the cellular device(s) used by the **target subject** will lead to evidence of the subject offense(s)

2

described herein as well as to the identification of individuals who are engaged in the commission of those criminal offense and related crimes.

5.      A cell-site simulator constitutes a "pen register" device within the meaning of Title 18, United States Code, Section 3127(3), in that it is "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted." The information it obtains does not include the contents of any communication.

Therefore, the applicant certifies that the subject offense(s) under investigation by the investigative agency(ies) include but are not necessarily limited to the subject offense(s); it is believed that the target subjects of this investigation and others yet unknown are using communication facilities in furtherance of the subject offense(s); and that the information likely to be obtained from the use of a pen register device in the form of electronic investigative techniques that capture and analyze signals emitted by cellular devices is relevant to the ongoing criminal investigation.

6.      Cellular telephones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers. [1]

7.      If authorized by the warrant that is being requested and to facilitate execution, the investigative agency(ies) intend to use an investigative device or devices (identified herein as a cell-site simulator) capable of broadcasting signals that will be received by cellular device(s) used

_____

[1]   Unique identifiers include electronic identifying numbers associated with the target cellular device and may include the telephone service, IMSI, ESN, IMEI, or MSID number.

by the **target subject** or receiving signals from nearby cellular devices. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the cellular device(s) used by the **target subject** and thereby prompt it to send signals that include the unique identifier of the device. Law enforcement may monitor the signals broadcast by the cellular device(s) used by the **target subject** and use that information to determine cellular device('s) telephone number(s) and unique identifier(s), even if the cellular device(s) is located inside a house, apartment, building or other private space.

8.     As set forth in the Affidavit, if authorized by the warrant that is being requested the investigative agency(ies) intend to employ an electronic investigative technique, that being a cell-site simulator, to detect radio signals that are emitted automatically at the time a cellular telephone is turned on, and periodically thereafter as long as the cellular telephone remains on, regardless of whether a call is being made, to communicate with the cellular infrastructure, including cell towers. The cell-site simulator sends signals to nearby cellular devices, including the cellular device(s) used by the **target subject**, and in reply, nearby cellular devices will broadcast signals that include unique identifiers. These signals contain identifying numbers for the telephone (*e.g.*, the telephone number, Electronic Serial Number ("ESN"), or International Mobile Subscriber Identification ("IMSI") number). The investigative agency(ies) intend to send signals in the vicinity of the **target subject** to connect with any cellular device(s) used by the **target subject** that will cause it, and non-target phones on the same provider network in close physical proximity, to emit unique identifiers, which will be obtained by the technology. The investigative agency(ies) will use the information collected to determine the currently unknown identifiers of the cellular device(s) being used by the **target subject**. By employing the technique at two or more locations, through the process of elimination, the investigative agency(ies) can isolate the ESNs or IMSIs corresponding

4

to the specific cellular device(s) used by the **target subject**, even if the cellular device(s) is located in a house, apartment, building, or other private space. The investigative agency(ies) do not seek, and the cell-site simulators does not intercept, the content of any telephone calls, text messages or electronic communications.

9.     The investigative agency(ies) intend to use the cell-site simulator to determine aforementioned unique identifiers at multiple locations and/or multiple times at the same location. The investigative agency(ies) may continue to use the cell-site simulator at various times during the time period authorized by the warrant being requested to determine the cellular device(s) being used by the **target subject**.

10.     The use of a cell-site simulator may interrupt and cause other cellular devices within its immediate vicinity to experience a brief disruption of service from the service provider. Any service disruption will be brief and temporary, and all operations will be conducted to ensure the minimal amount of interference to non-target cellular devices.

11.     The device may complete a connection with cellular devices determined not to be the cellular devices used by the **target subject**, and law enforcement will limit collection of information from devices other than ones used by the **target subject**. Once the investigative agency(ies) has identified the cellular device(s) used by the **target subject**, then to the extent that any information from a cellular device other than ones used by the **target subject** was collected, law enforcement will delete that information. Absent further order of the Court, the investigative agency(ies) will make no investigative use of information concerning non-targeted cellular devices - other than distinguishing the target cellular device(s) from all other devices.

12.     This Court has authority to issue the requested warrant under Federal Rule of Criminal Procedure Rule 41(b)(1) & (2) because, as described in the Affidavit, the **target subject** is currently believed to be located inside the Eastern District of Missouri. The investigative

5

agency(ies) plan to use a cell-site simulator as authorized by the requested warrant when they have reason to believe that the **target subject** is present. Before using the cell-site simulator, the investigative agency(ies) will first take steps to determine that the **target subject** is in the Eastern District of Missouri. Such steps may include physical surveillance, or other investigative techniques. Pursuant to Rule 41(b)(2), law enforcement may use the cell-site simulator outside the Eastern District of Missouri provided the **target subject** is within the district when the warrant is issued. After the investigative agency(ies), determine that the **target subject** is in the Eastern District of Missouri, they will continue to identify cellular device(s) used by the **target subject**, including by use of a cell-site simulator, without geographic limitation.

### Request for Cell-Site Simulator

13.     In light of the foregoing, the Government requests, pursuant to Federal Rule of Criminal Procedure 41 and Title 18, United States Code, Section 3123, that this Court issue a warrant authorizing the investigative agency(ies) to employ a cell-site simulator, described in the accompanying Affidavit and Attachment A, to capture and analyze radio signals, including the unique identifiers emitted by the target cellular device(s) used by the **target subject**, but not the content of any communications, to determine the target cellular device('s) telephone number(s), ESN(s) or IMSI(s) for a period of forty-five (45) days, during all times of day or night, following the issuance of the Court's Warrant -- *i.e.,* from February 7, 2018, to March 23, 2018, 11:59 p.m. (CT). The cell-site simulator may capture information related to such cellular telephone(s) when the telephone(s) is/are located in a protected space such as a residence.

14.     The Government further requests that this Court's warrant authorizing the use of the cell-site simulator to identify, capture, and analyze signals emitted by the target cellular device(s) used by the **target subject**, direct the investigative agency(ies) to neither retain nor make affirmative investigative use of the data acquired beyond that necessary to determine the

6

identification of the target cellular device(s) being used by the **target subject**. Once the target cellular device is located, then to the extent that any information from a cellular device other than the target cellular device was collected, it is requested that law enforcement be directed to delete that information. It is further requested that the investigative agency(ies) may continue to use the cell-site simulator at various times during the time period authorized by the warrant being requested to determine the cellular device(s) being used by the **target subject**.

15.     It is necessary to use the cell-site simulator whenever the **target subject** can be found and its use may acquire signaling information when the target cellular device(s) is located in a private space, such as a residence. The use of a cell-site simulator, as described herein, does not require a physical intrusion or trespass into any private space. Therefore, it is also requested that the investigative agency(ies), be permitted to use a cell-site simulator at times determined by investigators, including any time, day or night.

16.     The Government further requests that this Court's warrant authorizing the use of the cell-site simulator to identify, capture, and analyze signals emitted by any target cellular device(s) being used by the **target subject**, direct the investigative agency(ies) not to intercept the content of any telephone calls, text messages, or other electronic communications, made by the target cellular device(s) and that the warrant prohibit the seizure of any tangible property.

### Sealing and Miscellaneous Considerations

17.     The Government further requests, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice for a period of six months from the end of the period of authorized surveillance. Such a period of delay is justified. The use of a cell-site simulator does not require a physical intrusion into a protected space. Moreover, a cell-site simulator is, in essence, a pen register or trap and trace device. Pursuant to 18 U.S.C. §3123(d), non-disclosure of the existence of an order for pen

register or trap and trace device is permitted. A delay is further justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the **target subject** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). There is reasonable necessity for the use of the technique described above, for the reasons set forth above. See 18 U.S.C. § 3103a(b)(3).

18.     Identification of cellular devices used by the **target subject** by the methods described herein will begin within ten (10) days of the date of issuance of the requested Warrant and Order.

19.     Finally, in light of the ongoing nature of the investigation as reflected in the attached Affidavit, the Government requests that the Applications, the Affidavit, and the Warrant be sealed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated this _____7th_____ day of February, 2018.

Respectfully submitted,

JEFFREY B. JENSEN
United States Attorney

ANGIE B. DANIS, #64805MO
Special Assistant United States Attorney

8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

IN THE MATTER OF THE APPLICATION )
OF THE UNITED STATES OF AMERICA )  No. 4:18 MJ 7022 SPM
FOR A WARRANT TO AUTHORIZE USE OF )
A CELL-SITE SIMULATOR TO IDENTIFY )  **FILED UNDER SEAL**
THE CELLULAR DEVICE(S) USED BY )
**DEMETRIUS JOHNSON**. )

### AFFIDAVIT IN SUPPORT OF APPLICATION
### FOR A WARRANT TO AUTHORIZE USE OF A
### CELL-SITE SIMULATOR TO IDENTIFY THE CELLULAR DEVICE(S)

Michael W. Betz, being duly sworn, deposes and says that he is a Special Federal

Officer with the Federal Bureau of Investigation ("FBI"), duly appointed according to law

and acting as such.

#### Background of Affiant

I am a deputized Special Federal Officer (SFO) with the Federal Bureau of Investigation

(FBI). Additionally, I am employed as a Police Officer for the St. Louis Metropolitan Police

Department (SLMPD) and have been so employed for the past fifteen years.   I am presently

assigned to the St. Louis Division of the Federal Bureau of Investigation as a member of the

Violent Crimes Task Force. Through my training and experience, I am familiar with the debriefing

of cooperating witnesses and/or sources of information and methods of searching locations where

narcotics, narcotics proceeds, and/or weapons may be found. Additionally, I have been trained

and have experience in conducting surveillance, telephone toll analysis, and am familiar with the

manner of importation and distribution of narcotics as well as the payment methods utilized by

narcotic distributors. During the past fifteen years as a Police Officer with the SLMPD, I have

been involved in a multitude of drug, gang, and violent crime investigations involving arrests,

interviews, informant debriefings, and surveillances. I have also been the affiant on numerous Federal and State Search Warrant Affidavits and participated in numerous investigations that employed the use of PLW's, Pen Registers, and Title III wire taps.

### Background and Purpose of Affidavit

1.     I make this affidavit in support of an application for a warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic surveillance technique, that being a cell-site simulator (hereinafter "cell-site simulator") to identify the cellular device(s) used by:

**DEMETRIUS JOHNSON (DOB: 5/23/1994; SSN: XXX-XX-8920)** (hereinafter the "**target subject**").

2.     The facts alleged in this Affidavit come from my own investigation, my training and experience, and information obtained from other investigators and witnesses. Because of the limited purpose of this Affidavit, I have not included all of the facts known to me or other agents/officers of the Federal Bureau of Investigation, as well as other federal, state, and municipal law enforcement agencies (hereinafter referred to as "investigative agency(ies)") about this investigation.

3,     Based on the facts set forth in this Affidavit, there is probable cause to believe that violations of Title 21, United States Code, Section(s) 841(a)(1) and 846 (hereinafter the "subject offense(s)") have been committed, are being committed, and will be committed by the **target subject** as well as others known and unknown (hereinafter the "target subject(s)"). There is also probable cause to believe that identifying the cellular device(s) used by the **target subject** will lead to evidence of the subject offense(s), including the identification of individuals who are engaged in the commission of these offenses and identifying locations where the target subjects

2

engage in criminal activity; and, that the cellular device(s) used by the **target subject** is being used in connection with the commission of the offenses.

4.    One purpose of applying for this warrant is to determine the cellular device(s) used by the **target subject**.  As described herein, there is reason to believe the **target subject** and cellular device(s) used by the **target subject** are currently located somewhere within this district because the **target subject** is known to spend most of his time in this district.

5.    Because collecting the information authorized by the warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," the warrant is designed to comply with the Pen Register Statute as well as Rule 41.  See 18 U.S.C. §§ 3121-3127 (3) & (4). Therefore, the Application and Warrant include all the information required to be included in a pen register order.  See 18 U.S.C. § 3123(b)(1).

### Investigation and Probable Cause

6.    I am currently participating in an investigation with members of the St. Louis Metropolitan Police Department (SLMPD) Special Operations Division and Drug Enforcement Administration (DEA) regarding the illegal importation and distribution of narcotics by numerous individuals involved with the 14 Peabody Bloods Criminal Street Gang, which investigators believe is being led and directed by **Demetrius JOHNSON** (hereinafter "**target subject**").  The **target subject** and affiliates of this gang distribute heroin and fentanyl in St. Louis City, near the Peabody Housing Projects, and in some areas of St. Louis County.  Both St. Louis City and St. Louis County are located within the Eastern District of Missouri.  The **target subject** and affiliates of this gang commonly arm themselves with illegally-obtained firearms and commonly utilize violence to protect their narcotics and proceeds from their narcotics sales.  Members of the 14 Peabody Bloods use multiple cellular telephone numbers to coordinate their narcotics transactions

3

and commonly compartmentalize their narcotics trafficking, utilizing one cellular telephone for contact with buyers and a separate cellular telephone for contact with other distributors and/or suppliers. Additionally, the members of this gang are known to sometimes utilize a "dispatching" method of narcotics distribution in an attempt to evade law enforcement detection, wherein the buyer will contact the seller via cellular telephone, and the seller will contact a third party, directing them to complete the drug transaction with the buyer.

## SOURCES OF INFORMATION

7.    In                    , members of the SLMPD Special Operations Division identified a Confidential Source (hereinafter "CS-3")[2], who had specific information pertinent to the trafficking of heroin and fentanyl by the **target subject**. CS-3 advised that the **target subject** had numerous individuals selling narcotics for him and that the **target subject** and those individuals (some identified and some not) who distributed narcotics for him would utilize multiple cellular phones in conjunction with his narcotics trafficking. CS-3 further advised that he/she observed the **target subject** in possession of multiple cellular phones and knew the **target subject** to commonly compartmentalize his operations, utilizing one cellular telephone to contact purchasers and a different cellular telephone to contact other dealers and/or sources of supply.

8.    In                    , members of the Special Operations Division identified another Confidential Source (hereinafter "CS-4") who advised that members of the 14 Peabody Bloods

---

[2] SLMPD detectives began receiving information from CS #3 in                    CS #3 has prior arrests for
                    CS #3 has prior convictions for
                                                                                                        The
information CS #3 has provided has been corroborated by other confidential sources, public and law enforcement records, independent investigation, and by his/her proactive efforts in purchases of narcotics at the direction of the investigative team. In some instances, the information provided by CS #3 was against his/her own penal interests. CS #3 has gained this information through personal contact with the **target subject**, or his narcotic underlings, that are assisting in the distribution efforts. Additionally in some prior affidavits CS #3 was referred to as CS #2.

were actively distributing heroin and/or fentanyl in the St. Louis area. CS-4 was aware of arrests of 14 Peabody associates by law enforcement and knew of numerous individuals selling heroin and/or fentanyl and their corresponding cellular telephone numbers. CS-4 also advised that the **target subject** was in charge of the group and the other members of the group who distributed narcotics did so under the supervision of the **target subject**. CS-4 provided the following phone number, (314)-537-0649, as one of the phone numbers being utilized by the **target subject** and other members of the narcotic trafficking group.[3]

9.     During the course of this investigation, investigators contacted AMEREN Missouri, who advised that the **target subject** provided two telephone numbers as his own when acquiring electrical service at his residence. The first inquiry revealed the **target subject** was residing at 5528 Chippewa Apartment 2W Saint Louis, MO 63109. A later inquiry revealed the **target subject** had moved residences to 1264 Grant Dr. Saint Louis, MO 63132. Those phone numbers were (314) 699-1323 and (314) 745-9785, and were provided to Ameren by the **target subject** for both addresses. Additionally, investigators contacted a cooperating witness (hereinafter "CW-1"),[4] who has engaged in legal business activity with the **target subject**. CW-1 advised that the **target subject** provided him/her with telephone number (314) 699-1323, and that he/she had contacts with the **target subject** on this number in the past.

---

[3] The investigative team began receiving information from CS-4 in _____. CS-4 has prior arrests for _____. The information provided by CS-4 has been corroborated by other confidential sources, public and law enforcement records, independent investigation, and by his/her proactive efforts in other purchases of heroin at the direction of the investigative team. CS-4 began working for of the SLMPD in an attempt to receive consideration regarding an arrest. The investigative team believes that the information provided by CS-4 is accurate and reliable.

[4] The information provided by CW-1 has been proven to be reliable through surveillance and through other sources of information. CW-1 has no prior criminal history.

10.     In               2017, members of the FBI and SLMPD Special Operations
Division identified another Confidential Source (hereinafter "CS-5")[5], who had specific
information pertinent to the trafficking of heroin by the **target subject**. CS-5 advised that the
**target subject** is routinely in possession of numerous cellular telephones, which he utilizes for
his narcotics distribution network. CS-5 further advised that the **target subject** has numerous
subjects who work for him to distribute narcotics throughout the St. Louis region. CS-5 stated
that the **target subject** will also rent out his cellular telephones to those who work for him.  The
**target subject** will charge individuals a certain amount of money per week to maintain
possession of a cellular telephone and then that individual will have to provide the **target subject**
with a certain percentage of the profits made for that week from narcotics sales.  CS-5 further
advised that the **target subject** utilizes multiple addresses to store narcotics and firearms
throughout the St. Louis area.  CS-5 also stated that the **target subject** is a kilogram-level
narcotics dealer and he/she has observed the **target subject** in possession of multiple kilograms
of narcotics in the past.  CS-5 advised that the **target subject** is very careful about talking on
cellular telephones and will not give out his personal telephone numbers to everyone. CS-5 stated
that he/she does not personally have all of the **target subject's** cellular telephone numbers.  CS-
5 stated that when he/she needed to contact the **target subject**, he/she would contact cellular
telephone (314) 537-0649 or (314) 745-9785.  CS-5 stated the **target subject** would be very
careful about what he did and did not say on this cellular telephone in regard to illegal activity.

---

[5] SLMPD detectives began receiving information from CS-5 in               CS-5 has prior arrests for
                                                                                    The information CS-
5 has provided has been corroborated by other confidential sources, public and law enforcement records, independent
investigation, in some instances, the information provided by CS-5 was against his/her own penal interests. CS-5 has
gained this information through personal contact with **JOHNSON**, or his narcotic underlings, that are assisting in the
distribution efforts.

CS-5 further identified Marquis BROWN as a street-level narcotics dealer who would purchase his narcotics from the **target subject**.

11.     During the course of the investigation, through the use of law enforcement resources and information provided by various Confidential Sources, the following telephone numbers were identified as being used and/or previously used by the **target subject** and those who distribute narcotics at his direction: (314) 363-2254; (314) 296-0706; (314) 537-0649; (573) 797-0630; (314) 502-0874; (314) 240-6243; (314) 484-3817; (314) 712-5577; (314) 236-1656; and (314) 740-1893.

## **CONTROLLED PURCHASES**

12.     On or about May     2017, members of the Special Operations Division conducted a controlled purchase of a quantity of heroin/fentanyl from telephone number (314)-363-2254, utilizing CS    It should be noted that CS    had contacted telephone number (314)-363-2254 on several occasions in the past. CS    advised that though the cellular telephone would routinely be answered by different individuals, the **target subject** would often answer and be in possession of the phone. CS    further advised that he/she was familiar with the voice of the **target subject**, and several members of the narcotic trafficking group, and was able to distinguish their voices when talking on the telephone. The investigative team met CS    at a predetermined location, at which time CS    contacted phone number (314) 363-2254. CS    was then directed to a residence at 1414 Lasalle, where a member of the **target subject's** narcotic trafficking group provided CS-    several capsules of heroin/fentanyl in exchange for US currency.  At the conclusion of the operation, the investigative team retrieved the suspected heroin/fentanyl. A search was conducted of CS    for any contraband, which was met with negative results.  It should be noted that CS    advised that inside the residence at 1414 Lasalle, he/she observed numerous

7

individuals associated with the group, a large number of firearms, and a large amount of heroin/fentanyl. The purchased narcotics were transported to the SLMPD Laboratory for analysis. The laboratory found the item to weigh .82 grams and to test positive for heroin.

13.     On or about May 10, 2017, after reviewing an affidavit submitted by SLMPD Detective Thomas Strode, the Honorable Judge Timothy Boyer of the 22nd Judicial Circuit Court of the State of Missouri issued an order authorizing the interception and monitoring of location data relative to telephone number (314) 363-2254.  In the course of monitoring this precision location information (PLI), Detective Strode was able to confirm, through physical surveillance, that the **target subject** was located where this phone was located on numerous occasions.

14.     On or about May     2017, members of the Special Operations Division conducted a controlled purchase of a quantity of heroin/fentanyl from telephone number (573) 745-0331, utilizing CS   . CS   advised the investigative team that the **target subject**, and other members of the narcotic trafficking group, provided him/her with telephone number (573) 745-0331. CS-  was advised to contact this telephone number if he/she needed to purchase narcotics. CS stated the **target subject** was not in possession of this phone when he/she contacted it. CS further advised that he/she was unfamiliar with the subject who answered telephone number (573) 745-0331. The investigative team met CS-3 at a predetermined meet location, at which time CS   contacted phone number (573) 745-0331.  CS   was then directed to the residence at 1426 Peabody, where James FIELDS (another identified member of the **target subject's** drug distribution network)  provided CS   a quantity of heroin/fentanyl in exchange for US currency. It should be noted that 1426 Peabody is an address that has previously been utilized by the **target subject**. On February 10, 2016 the target subject received (3) traffic citations from Webster Groves Police Department where 1426 Peabody was listed as his home address. Furthermore, on

October 26, 2016 SLMPD Officers took a report for a Domestic Assault 3rd and Property Damage 2nd. During the incident Ashley Dickerson reported that her boyfriend of one year, identified as the **target subject**, struck her and damaged her cellular telephone following an argument. The **target subject** was placed wanted and later arrested for the charges. Furthermore, an inquiry conducted by the investigative team through AMEREN Missouri revealed that utilities are currently active at 1426 Peabody in the name of Ashley Dickerson. It should further be noted that CS    advised the investigative team that he/she is familiar with FIELDS as being a known associate of the **target subject** and documented associate of the 14 Peabody Bloods. FIELDS routinely distributes heroin and fentanyl for the **target subject**. At the conclusion of the operation, the investigative team retrieved the suspected heroin/fentanyl.  A search was conducted of CS    for any contraband, which was met with negative results. It should be noted that CS    advised that when he/she encountered FIELDS, FIELDS was armed with a handgun and a plastic bag containing a large amount of heroin/fentanyl. The purchased narcotics were transported to the SLMPD Laboratory for analysis. The laboratory found the item to weigh .25 grams and to test positive for heroin.

15.    On or about June    2017, members of the investigative team conducted a controlled purchase of a quantity of heroin/fentanyl from the cellular telephone (314) 537-0649, utilizing CS- and a Saint Louis Metropolitan Police Department Undercover Officer (hereinafter "UC-l"). It should be noted that CS    was provided this telephone number by the **target subject**. CS    further stated that several subjects will be in possession of and answer this phone; however, the **target subject** also frequently answers the phone. Members of the investigative team met CS    at a predetermined location, where CS    placed a phone call to (314) 537 -0649, arranging a purchase of $60 worth of heroin/fentanyl from the group.  CS    and UC-l were directed to the area of

Truman and Park, within the City of St. Louis. A short time later, a black male, later identified as Gregory IVY, responded to the location in a brown colored Pontiac Grand Prix with a Missouri temporary tag affixed the rear windshield. It should be noted that during the course of the investigation, IVY was identified by CS and CS as being a known associate of the **target subject** who distributes heroin and fentanyl for him.

16.     Initially, UC-l entered the vehicle with the subject and observed a plastic bag containing several hundred clear capsules containing a white powdered substance in his possession. UC-1 exited the vehicle and CS subsequently entered the vehicle and provided IVY with $60, at which time IVY provided CS several capsules containing suspected heroin/fentanyl. CS subsequently relinquished the clear capsules to UC-l. Prior to leaving the secure location, CS was searched by an investigator for any contraband, which was met with negative results. The purchased narcotics were transported to the SLMPD Laboratory for analysis. The laboratory found the item to weigh .95 grams and to test positive for fentanyl. It should further be noted that at the conclusion of the controlled purchase, the investigative team located the vehicle that the subject was occupying to be parked in front of the residence at 1426 Peabody, where the **target subject** is known to frequent.

17.     On or about August 28, 2017, members of the investigative team conducted a controlled purchase of a quantity of heroin/fentanyl from the cellular telephone number (314) 537-0649, utilizing two Saint Louis Metropolitan Police Department Undercover Officers (hereinafter "UC-2" and "UC-3"). Members of the investigative team responded to a predetermined location where UC-2 placed a phone call to the (314) 537-0649, arranging a purchase of $140 of heroin/fentanyl. The subject who answered the phone subsequently directed UC #2 to the area of Park Avenue and 14th Street, within the City of St. Louis.

10

18.     After departing the briefing location, UC-2 and UC-3 responded to the area of Park Avenue and 14th Street, where subsequent phone calls were placed to (314) 537-0649. After numerous changes in location and phone calls back and forth between UC-2 and the subject utilizing the device with telephone number (314) 537-0649, UC-2 and UC-3 drove to the area of 14th Street and Rutger, within the City of St. Louis. A short time later, FIELDS, who was positively identified, approached their vehicle and engaged UC-3 in a hand-to-hand drug transaction, providing UC-3 a quantity of suspected heroin/fentanyl in exchange for $140 in U.S. Currency. UC-2 and UC-3 then responded back to the aforementioned briefing location, where they relinquished custody of the narcotics to the members of the investigative team. The suspected narcotics purchased during the operation were transferred to the FBI and are pending laboratory analysis.

19.     On or about September 8, 2017, members of the investigative team conducted a controlled purchase of a quantity of heroin/fentanyl from the cellular telephone number (314) 537-0649, later determined to be utilized on this date by IVY. Members of the investigative team responded to a predetermined location, where UC-3 placed a phone call to telephone number (314) 537-0649, arranging a purchase of $200 of heroin/fentanyl. An unknown subject subsequently directed UC-3 to the area of Park Avenue and 14th Street, within the City of St. Louis. After departing the briefing location, UC-3 responded to the area of 14th Street and Lasalle Avenue, where subsequent phone calls were placed to phone number (314) 537-0649. UC-3 was then directed to respond to the area of 1435 Park Avenue. Moments later, IVY responded to the area in a silver Nissan, bearing Missouri license plates HN5-G8U, where UC-3 provided IVY with $200 in US currency and IVY provided UC-3 with several clear capsules containing suspected heroin/fentanyl. UC-3 then responded back to the aforementioned briefing location while the

11

investigative team conducted post operation surveillance on IVY.  IVY was followed as he travelled to the Salama Market, located at 1525 Chouteau. IVY remained in his vehicle on the parking lot of the market until a black Chrysler 300 pulled onto the parking lot and parked beside him. IVY exited his vehicle and the driver of the Chrysler 300, who was positively identified by the investigative team as the **target subject**, also exited his vehicle. The two conversed on the parking lot before entering the market.  Approximately 6-7 minutes later, both subjects exited the market and entered their vehicles. When IVY exited the market, he was holding a plastic bag.  Both subjects exited the parking lot, responded to and entered the residence at 1426 Peabody.  The narcotics purchased during the operation were transferred to the FBI and are pending laboratory analysis.

20.     On or about October 27, 2017, members of the investigative team conducted a controlled purchase of heroin/fentanyl from telephone number (314) 537-0649, being utilized by the **target subject** and members/associates of the 14 Peabody Bloods.   Members of the investigative team responded to a predetermined location where UC-2 placed a phone call to (314) 537-0649, arranging a purchase of $200 worth of heroin/fentanyl from the group.  An unidentified male who answered the phone directed UC-2 to the area of Park Avenue and 14th Street, in the City of St. Louis, to complete the transaction. After departing the briefing location, UC-2 responded to the area of Park Avenue and 14th Street and subsequently contacted the phone number (314) 537-0649. The subject utilizing the telephone then directed UC-2 to the Walgreen's Parking Lot (1530 Park Avenue, St. Louis, MO).  A short time later, a maroon Chevrolet Impala, bearing Illinois license plates Z60-9479, parked next to UC-2.  An unknown black male, who was seated in the front passenger seat, exited the vehicle and approached UC-2, at which time UC-2 provided the unknown black male with $200 in exchange for several capsules of suspected

12

heroin/fentanyl. UC-2 then responded back to the briefing location while the investigative team conducted post-operation surveillance on the maroon Chevrolet. The vehicle was observed travelling back inside the Peabody housing projects and parking in front of the residence at 1426 Peabody. The unknown driver exited the vehicle and entered the residence at 1426 Peabody. The narcotics purchased during the operation were retrieved from UC-2 and transferred to the FBI and are awaiting laboratory analysis.

21.     On or about December    , 2017, CS   , at the direction of members of the investigative team, contacted phone number (314) 537-0649 to arrange for the controlled purchase of a small amount of fentanyl. Upon contacting phone number (314) 537-0649, CS-3 was directed to the intersection of Ohio and Arsenal, within the City of St. Louis. Upon arrival at the predetermined location, CS   was met by Daichi HORIACE, who members of the investigative team knew to be associated with the 14 Peabody Bloods. HORIACE approached CS   on foot, at which time CS   provided HORIACE with $20.00 United States Currency. HORIACE then provided CS   with four (4) capsules of suspected fentanyl before CS   departed the area. CS   was searched at the conclusion of the operation and no additional contraband was located. Investigators then observed HORIACE return to an apartment complex located at 2623 Arsenal. The purchased narcotics were transported to the SLMPD Laboratory for analysis. The laboratory found the item to weigh .36 grams and to test positive for fentanyl.

22.     On or about January    2018, CS   , at the direction of members of the investigative team, contacted (314) 537-0649 to arrange for the controlled purchase of a small amount of fentanyl. Upon contacting (314) 537-0649, CS   immediately recognized the voice of the subject who answered (314) 537-0649 as that of the **target subject.** CS   was directed by the **target subject** to the parking lot at 1300 Lafayette Ave., within the City of St. Louis. Upon arrival at the

13

predetermined location, a Grey Pontiac Grand AM arrived and made contact with CS     The

vehicle was later determined to be occupied by Christopher PIPES[6] and the **target subject.** CS

engaged the front seat passenger (the **target subject**) in a hand to hand transaction and purchased

an amount of fentanyl for $50.00 in United States Currency. CS     departed the area and the vehicle

containing PIPES and the **target subject** depart the parking lot. CS     was searched at the

conclusion of the operation and not found to be in possession of any additional controlled

substances.

23.     The purchased narcotics were transported to the SLMPD Laboratory for analysis.
The laboratory found the item to weigh 1.26 grams and to test positive for fentanyl.

24.     On or about January     2018, CS     at the direction of members of the investigative

team, contacted (314) 537-0649 utilizing a series of text messages. As previously described, CS-

regularly receives text communication from the **target subject** and other subjects utilizing (314)

537-0649**.** The text messages were met with negative results, to the investigative team directed

CS     to make a phone call to (314) 537-0649. That call and a series of calls following were also

met with negative results. CS     advised that this is a common occurrence when possessor of the

phone is "capping up" or "re-upping", meaning that the possessor of the phone is replenishing his

drug supply. While members of the investigative team were attempting to determine an alternate

plan and were not in the presence of CS     CS     received a telephone call from (314) 537-0649.

CS·     immediately recognized the voice of the subject utilizing (314) 537-0649 as Diachi

HORIACE     CS     inquired if HORIACE had received the text messages, to which HORIACE

replied "Yes," and then directed CS     to the area of Jefferson & Arsenal, within the City of St.

---

[6] Christopher PIPES is previously known to these investigators.  PIPES is a known associate of JOHNSON and known
to be involved in his drug distribution network.

Louis. [Affiant Note: The series of events and communication with HORIACE was not witnessed or recorded by the investigative team. It was later relayed to the team by CS .]

25. CS responded to the location and texted (314) 537-0649, stating, "I'm here." HORIACE immediately called CS back utilizing cellular phone number (314) 285-0710 and directed him/her to walk down the street to another location. Eventually at 2910 California, HORIACE exited an apartment and sold an amount of Fentanyl to CS for $100.00 in U.S. Currency. CS then relinquished the suspected narcotics to the investigative team.

26. The narcotics purchased during the operation were retrieved from CS and transferred to the FBI and are awaiting laboratory analysis.

## SURVEILLANCE & PRIOR ORDERS

27. On or about May 10, 2017, after reviewing an affidavit submitted by SLMPD Detective Thomas Strode, the Honorable Judge Timothy Boyer of the 22nd Judicial Circuit of the State of Missouri issued an order authorizing the interception and monitoring of precision location information (PLI) relative to telephone number (573) 797-0630. In the course of monitoring telephone number (573) 797-0630, and through information obtained from CS it was revealed that this phone was primarily being kept in north Saint Louis County and being utilized to dispatch customers to various locations in the Peabody Housing projects. When individuals would contact (573) 797-0630, the unknown subject who answered that telephone would send the customers to a separate location in order to purchase narcotics. This was confirmed through use of physical surveillance, information obtained from CS as well as information received from the PLI.

28. On or about May 24, 2017, after reviewing an affidavit submitted by SLMPD Detective Thomas Strode, the Honorable Judge Timothy Boyer of the 22nd Judicial Circuit of the

15

State of Missouri issued an order authorizing the interception and monitoring of the precision location information (PLI) relative to telephone number (314) 699-1323. In the course of monitoring the PLI for telephone number (314) 699-1323, Detective Strode was able to confirm through surveillance that the **target subject** was in possession of this phone. During the periods of physical surveillance, the **target subject** was always located in proximity to the cellular phone. This is consistent with the **target subject** having sole possession of the phone. Furthermore, surveillance of the **target subject**, utilizing the precision location information (PLI), revealed the **target subject** associating with numerous subjects known to law enforcement as high-ranking narcotics traffickers. Detective Strode and the investigative team have observed the **target subject** at numerous known locations that are associated with both the distribution and importation of narcotics in the St. Louis area. On June 15, 2017, members of the investigative team, also though the use of the PLI, observed the **target subject** travel to the Atlanta, GA area, and remain there for only 10 hours, before returning to St. Louis. Prior to the phone pings showing **target subject** in route to Georgia, the investigative team observed a black Nissan, bearing Texas plate JSF-1950, parked in the rear of the **target subject's** residence at 5528 Chippewa. The investigative team also observed the **target subject** operating this vehicle. During the time the pings were in Georgia, the investigative team did not observe the **target subject** or this vehicle during surveillance. When the pings revealed the cellular telephone was back in the vicinity of the residence at 5528 Chippewa, the investigative team observed the aforementioned listed black Nissan parked at 5528 Chippewa. Atlanta, GA is a known source city for heroin and fentanyl and, in my training and experience, short trips, such as this one, to known source cities are consistent with drug trafficking activity. Narcotics traffickers generally

16

try not to stay long in the same place as their source of supply in an effort to avoid law enforcement detection.

29.     On or about November 3, 2017, United States Magistrate Judge for the Eastern District of Missouri Noelle Collins authorized a warrant for precision location information (PLI) on subject cellular telephone (314) 537-0649.

30.     In November of 2017, CS   advised the investigative team that he/she was very familiar with the individuals who operated cellular telephone (314) 537-0649, and could easily identify who was in possession of the phone by their voice. CS   further advised that sometimes the subject who answered the phone would also distribute heroin/fentanyl to a customer; however, often times, the subject who answered the phone would not be the same subject who distributed heroin/fentanyl to a customer.

31.     On or about November 30, 2017, the investigative team was monitoring the location of the PLI of telephone number (314) 537-0649. At this time, the PLI was in the vicinity of the Walgreen's Parking Lot (1530 Park Avenue, St. Louis, MO). The investigative team made contact with CS   who advised that the **target subject** was currently in possession of the cellular telephone and that he was directing customers to the Walgreen's parking lot. Members of the investigative team responded to the lot and began conducting surveillance. A short time after members of the investigative team arrived on the parking lot, a marked SLMPD vehicle pulled onto the parking lot. At this time, the investigative team observed the **target subject** driving the aforementioned black Chrysler 300, with his driver's window rolled down. The **target subject** pulled beside a sedan that was parked on the lot and waived his arm, as if to instruct the occupants of the sedan to follow him. The **target subject** then pulled off the lot and the sedan began following him as he travelled north on 14th Street. A few moments after this, the black Chrysler

17

300 was observed parked in front of the residence at 1426 Peabody. The investigative team again made contact with CS- who advised that the **target subject** was still in possession of the cellular telephone bearing telephone number (314) 537-0649 and that he was now directing customers to 1426 Peabody.

## TELEPHONIC INTERCEPTS

32.     In November of 2017, members of the investigative team began monitoring and reviewing a series of pre-recorded phone calls from the Saint Louis City and Saint Louis County Justice Center. Of note are the following:

33.     On January 21, 2017, Davante LINDSEY contacted phone number (314) 745-9785 from the Saint Louis City Justice Center. It should be noted that LINDSEY is a known associate of the **target subject** and a documented associate of the 14 Peabody Bloods. He is currently being held on Murder 2nd charges. During the course of the conversation, the **target subject** stated that he worked Monday through Friday. LINDSEY then asked who got it on the weekend (a reference to the cellular phone), and asked if FIELDS had it on weekends. The **target subject** then informed the **target subject** that he was making 43 or 42 a day. The **target subject** then stated on a slow day, he does 33 or 32, but at least 3. The investigative team believes this is a reference to the money that the **target subject** was earning a day, with "43" being a reference to $4,300. The **target subject** then informed LINDSEY that he had been saving and by the summer, he will have 100 (a reference to $100,000).

34.     On March 6, 2017, Armond CALVIN contacted phone number (314) 699-1323, from the Saint Louis City Justice Center. It should be noted that CALVIN is a known associate of the **target subject**. CALVIN has been known to distribute narcotics and commit acts of violence, particularly with Christopher RHODES. RHODES, is a known associate of the **target subject** and

18

documented member of 14 Peabody Bloods, who distributes narcotics with him. Information obtained from CS and CS revealed that RHODES was often in possession of the cellular telephones being utilized to direct customers to locations for narcotic sales. During the conversation, CALVIN referenced a feud between RHODES and the **target subject**. CALVIN informed the **target subject** that RHODES said he (RHODES) would take his (the **target subject's**) phones away. CALVIN later informed the **target subject** that RHODES made a statement that when he (RHODES) got out of jail, he was taking his phones away from FIELDS and that he was upset the **target subject** gave FIELDS his phones. The investigative team is of the opinion that this is a reference to cellular telephones being utilized to conduct narcotics transactions.

35.    On June 30, 2017, FIELDS contacted (314) 745-9785, from the Saint Louis City Justice Center. During the conversation, FIELDS informed the **target subject** that his "joint" was hidden under the cabinet. Your investigator is aware that the term "joint" is often used to refer to a firearm. He then informed the **target subject** that the "other shit" was hidden inside the smoke detector, which he said the same place he hid it last time. The investigative team is of the belief and opinion that the "other shit" is a reference to illicit narcotics. Later, FIELDS stated he left the "mobiles" (a reference to cellular telephones) on the counter, the "joints" on the couch, money under a cabinet, and stated the "other shit" isn't put together. On June 30, 2017 FIELDS was arrested for Exhibiting a Weapon in the City of St. Louis, for which he was being held at the time of phone call.

36.    On July 28, 2017, Durrand JONES contacted (314) 699-1323, from the Saint Louis City Justice Center. It should be noted that JONES is a known associate of the **target subject** and a documented member of the 14 Peabody Bloods. He was being held on Robbery 1st charges at the

19

time of the phone call. The phone was initially answered by FIELDS, who informed JONES, "we at Salama's." It should be noted that when FIELDS answered the phone, JONES asked who he is talking to, to which the subject replies, "Nunu," which is the street moniker utilized by FIELDS to identify himself. JONES then told FIELDS that he needed a favor and he needed him to "pull up on someone." JONES then told FIELDS to be ready and someone will call him in a few days. The **target subject** then took control of the phone and JONES asked the **target subject** to take care of that for him. It should be noted that a large part of the conversation is mumbled and certain portions are inaudible; however, the investigative team is of the belief that JONES was asking for the **target subject** and FIELDS to commit an act of violence for him when JONES asked them to "pull up on someone." Members of the investigative team believe that this phrase references a drive-by shooting.

37.     On November 9, 2017, Damon JOHNSON contacted (314) 745-9785 from the Saint Louis City Justice Center. It should be noted that Damon JOHNSON is a known associate of the **target subject.** At the time of the incident, he was being held on firearm charges. During the conversation, Damon JOHNSON informed the **target subject** that "Clayton" is in jail. Damon JOHNSON then asked another individual to get "Clayton." Damon JOHNSON then referred to "Clayton" as "white boy Clayton" and as a "customer." The investigative team identified "Clayton" as Clayton BAUER. BAUER then gets onto the phone and informs the **target subject** that he was arrested on a gas station lot. An inquiry revealed that BAUER was arrested by Saint Louis County Police on October 27, 2017 for Possession of a Controlled Substance and Resisting Arrest. The investigative team is of the belief and opinion that BAUER purchases narcotics from the **target subject**.

20

38.　On November 30, 2017, FIELDS contacted phone number (314) 745-9785 from the Saint Louis County Justice Center. It should be noted that FIELDS was being held on a warrant for drug charges. During the course of the conversation, he is requesting the **target subject** provide money for his bail. FIELDS also refers to the **target subject** as "Meechie" during the conversation. This is the street moniker that is utilized by the **target subject**. During the course of the conversation, FIELDS asks the **target subject** if he has his "joint," to which the **target subject** replies yes. FIELDS then offers to sell the **target subject** his "joint" in order to make bond. It should be noted that a "joint" is a common term utilized in reference to a firearm. FIELDS later calls the phone number back and talks to IVY, who FIELDS refers to as "Scooby." "Scooby" is the street moniker utilized by IVY. During this conversation FIELDS describes the "joint" as a sexy, army green thing. FIELDS further states he thinks it will sell for at least $400.

39.　On December 26, 2017, members of the Saint Louis DEA Fields Division were monitoring a court-authorized Title III wiretap on a cellular telephone belonging to Marquise BROWN. BROWN contacted cellular telephone (314) 745-9785 and spoke to the **target subject**[7]. BROWN subsequently asked if he could meet and get "3." While monitoring the cellular telephone of BROWN, members of the DEA monitored other phone calls made by BROWN to other unknown cellular telephone numbers where BROWN asks to get "3." It is the opinion of the investigative team, based on their knowledge of the group, their training, previous experiences, and information provided from several confidential sources, that BROWN is contacting (314) 745-9785 as a source of narcotic supply to purchase narcotics.

---

[7] Members of the investigative team listened to this phone call, and upon comparing the voice of the subject talking to Brown, with known voice recordings of JOHNSON, were unable to determine if this voice was that of JOHNSON. During the week of January 29, 2018, members of the investigative team met with CS· , and played the call for him/her. CS    definitively stated that the voice of the subject in question was that of JOHNSON.

40.     In particular, I know based on my training and experience that individuals involved in organized criminal activity, such as drug trafficking and money laundering, will often utilize multiple cellular telephones for use with their criminal activities in order to evade law enforcement detection. Such cellular telephones will be used for a limited period of time to communicate with co-conspirators, after which time they will be discarded. Members of organized criminal activity will use multiple telephones for brief periods of time in order to shield their activities from electronic surveillance by law enforcement. Many times, these telephones will be subscribed under a fictitious name for a limited period of time, because individuals engaged in organized criminal activity hope to evade the discovery of their use of a particular telephone, and thereby hope to frustrate law enforcement's attempts to overhear their telephone calls. Furthermore, based on the **target subject**'s prior history with cellular telephones, investigators believe that the **target subject** is in possession of and utilizing multiple phones to further his drug trafficking.

41.     In addition, I believe that identification of any and all cellular devices used by the **target subject** through the use of a cell-site simulator will constitute and lead to evidence concerning the commission of the subject offense(s). For example, by identifying the target cellular device(s) used by the **target subject**, the investigative agency(ies) will be able to determine through a review of available telephone records whether such telephones are subscribed under a real name. If they are not, the **target subject**'s use of telephones under fictitious subscriber information will itself constitute evidence of consciousness of being engaged in criminal activity. From my training and experience, I know that narcotics traffickers will frequently use fictitious subscriber names in order to shield their identities from law enforcement. To the extent the use of the cell-site simulator reveals that the **target subject** is using multiple cellular telephones for short periods of time, in addition to the **target subject**'s prior use of other cellular telephones, that itself

22

constitutes evidence that the **target subject** is engaged in efforts to shield **target subject's** criminal activities from detection. Additionally, discovering the identity of cellular telephones used by the **target subject** may permit law enforcement to determine the identities of possible criminal associates and establish a factual predicate for the interception of wire communications over these telephones in furtherance of the current investigation.

42. The investigation has demonstrated that the **target subject** is using cellular devices in connection with the commission of offenses involving ongoing violations of Title 21, United States Code, Section(s) 841(a)(1) and 846 (the subject offense(s)).

43. It is critical that the investigative team be able to identify the cellular devices used by the **target subject** thereby assisting in:

- the identification of the co-conspirators, aiders, and abettors who are participating in the illegal activities as well as the nature and scope of the illegal activities;

- may lead to identification, location and seizure of contraband or other fruits and instrumentalities of the crime;

- identify dates and locations where illegal activity has taken place or may take place in the future;

- help identify financial transactions and monetary transfers used to facilitate and continue criminal activities as well as the existence and location of records, bank accounts, and businesses pertaining to those activities;

- sales and purchases of equipment, materials, and goods used to aid the co-conspirators in their endeavors as well as the location and use of assets accumulated;

- identify travel, safe-houses, and locations where goods, materials and personnel stay or are kept; and

23

- identify the existence of other communication facilities, including telephones, computers, e-mail and other electronic accounts used to by co-conspirators to communicate.

Thus, your affiant believes that the requested authorization would be a valuable asset in achieving the overall goals of the investigation.

### **Manner of Execution**

44.     The investigative agency(ies) plan to use the information requested in the attached Application to identify the cellular device(s) used by the **target subject** along with the telephone number, ESN or IMSI numbers assigned to or utilized by the cellular device(s).

45.     Based upon discussions I have had with other law enforcement agents and in my training and experience, I am informed that cellular telephones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

46.     To facilitate execution of the requested warrant, the investigative agency(ies) and I seek to use an investigative device known as a cell-site simulator that sends signals to nearby cellular devices, including the cellular device(s) used by the **target subject**. As set forth in this affidavit, if authorized by the warrant that is being requested the investigative agency(ies) intend to employ a cell-site simulator, to detect radio signals that are emitted automatically at the time a cellular telephone is turned on, and periodically thereafter as long as the phone remains on, regardless of whether a call is being made, to communicate with the cellular infrastructure, including cell towers. The cell-site simulator sends signals to nearby cellular devices, including

the cellular device(s) used by the **target subject**, and in reply, nearby cellular devices will broadcast signals that include unique identifiers. These signals contain identifying numbers for the telephone (e.g., the telephone number, Electronic Serial Number ("ESN"), or International Mobile Subscriber Identification ("IMSI") number).

47.     The investigative agency(ies) intend to send signals in the vicinity of the **target subject** to connect with any cellular device(s) used by the **target subject** that will cause it, and non-target phones on the same provider network in close physical proximity, to emit unique identifiers, which will be obtained by the technology. The investigative agency(ies) will use the information collected to determine the currently unknown identifiers of the cellular device(s) being used by the **target subject**. By employing the technique at two or more locations, through the process of elimination, the investigative agency(ies) can isolate the ESNs or IMSIs corresponding to the specific cellular device(s) used by the **target subject**, even if the cellular device(s) is located in a house, apartment, building, or other private space. The investigative agency(ies) do not seek, and the cell-site simulators does not intercept, the content of any telephone calls, text messages or electronic communications.

48.     The investigative agency(ies) will use the cell-site simulator when they have reason to believe that the **target subject** is present. Investigative agency(ies) will collect the identifiers emitted by cellular devices in the immediate vicinity of the target cellular device(s) when the **target subject** is in multiple locations and/or multiple times at a common location. Through the process of elimination the investigative agency(ies) will use this information to identify the target cellular device(s), because only the target cellular device(s) unique identifiers will be present in all or nearly all locations. Once investigators ascertain the identity of the target cellular device(s) used by the **target subject**, they will cease using the investigative technique.

25

49.     The **target subject** is currently believed to be located inside the Eastern District of Missouri.  Before using the cell-site simulator, the investigative agency(ies) will first take steps to determine that the **target subject** is in the Eastern District of Missouri.  Such steps may include physical surveillance, or other investigative techniques.  Pursuant to Rule 41(b)(2), law enforcement may use the cell-site simulator outside the Eastern District of Missouri provided the **target subject** is within the district when the warrant is issued.  After the investigative agency(ies) determine that the **target subject** is in the Eastern District of Missouri, they seek to identify cellular device(s) used by the **target subject**, including by use of a cell-site simulator, without geographic limitation.

50.     The investigative techniques described herein may interrupt cellular service of phones or other cellular devices within its immediate vicinity.  Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices.  In order to connect with the Target Cellular Device, the device may briefly exchange signals with all phones or other cellular devices in its vicinity.  These signals may include cell phone identifiers.  The device will not complete a connection with cellular devices determined not to be the Target Cellular Device, and law enforcement will limit collection of information from devices other than the Target Cellular Device.  To the extent that any information from a cellular device other than the Target Cellular Device is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Cellular Device from all other cellular devices.

51.     None of the investigative techniques that may be employed as a result of the present application and affidavit require a physical intrusion into a private space or a physical trespass.

26

Electronic surveillance techniques such as pen register and cellular telephone identification typically have not been limited to daytime use only. Furthermore, the criminal conduct being investigated is not limited to the daytime. Therefore, the fact that the present application requests a warrant based on probable cause should not limit the use of a cell-site simulator to daytime use only. Accordingly, the investigative agency(ies), request the ability to employ the cell-site simulator at any time, day or night.

52. Identification of cellular devices used by the **target subject** by the methods described herein will begin within ten (10) days of the date of issuance of the requested Warrant and Order.

### Request for Authorization to Use a Cell-site Simulator to Capture Signals Emitted by Cellular Telephones

53. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to Federal Rule of Criminal Procedure 41. The proposed warrant also will function as a pen register order under 18 U.S.C. § 3123.

54. In light of the foregoing, I respectfully request, pursuant to Federal Rule of Criminal Procedure 41 and Title 18, United States Code, Section 3123, that this Court issue a warrant authorizing the investigative agency(ies) to employ a cell-site simulator, described in this Affidavit and Attachment A, to capture and analyze radio signals, including the unique identifiers emitted by the target cellular device(s) used by the **target subject**, but not the content of any communications, to determine the target cellular device(s) telephone number, ESN or IMSI for a period of forty-five (45) days, during all times of day or night, following the issuance of the Court's Warrant -- *i.e.,* from February 7, 2018, to March 23, 2018, 11:59 p.m. (CT). The cell-site simulator may capture information related to such cellular telephone(s) when the telephone is located in a protected space such as a residence.

27

55.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice for a period of six months from the end of the period of authorized surveillance. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cellular Device would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). There is reasonable necessity for the use of the technique described above, for the reasons set forth above. See 18 U.S.C. § 3103a(b)(3).

Given the nature of the investigation described herein, agents do not believe the investigation will reasonably be concluded in the next 180 days. Any safety concerns to cooperators, undercover agents, witnesses that will not be resolved or mitigated in less than 6 months.

56.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cellular Device outside of daytime hours.

57.     Finally, in light of the ongoing nature of the investigation as reflected in the

attached Affidavit, applicant requests that the Applications, the Affidavit, and Warrant be sealed.

_2-7-18_
DATE

_SFO-FBI_

Michael W. Betz
Special Federal Officer
Federal Bureau of Investigation

Sworn to and subscribed before me this _____ day of February, 2018.

SHIRLEY P. MENSAH
UNITED STATES MAGISTRATE JUDGE
Eastern District of Missouri

29

## ATTACHMENT A

PURSUANT TO AN INVESTIGATION OF:

**DEMETRIUS JOHNSON (DOB: 5/23/1994; SSN: XXX-XX-8920)** (hereinafter the "**target subject**")

for violations of Title 21, United States Code, Section(s) 841(a)(1) and 846 (hereinafter the "subject offense(s)"), the Warrant authorizes the Federal Bureau of Investigation and other authorized federal/state/local law enforcement agencies (hereinafter referred to as "investigative agency(ies)") to use an electronic surveillance technique, that being a cell-site simulator (hereinafter "cell-site simulator") for a period of forty-five (45) days following the issuance of the Warrant i.e., from February 7, 2018, to March 23, 2018, 11:59 p.m. (CT), at all times of day and night, to determine the electronic identifying numbers of any cellular device(s) (hereinafter referred to as the "target cellular device(s)") used by the **target subject** by collecting radio signals, including the unique identifiers, emitted by the target cellular device(s) and other cellular devices in its vicinity, when the investigative agency(ies) have reason to believe that the **target subject** is present.

The Warrant does not authorize the interception of any telephone calls, text messages, or other electronic communications, and the Warrant prohibits the seizure of any tangible property. The Court finds reasonable necessity for the use of the technique authorized above. See 18 U.S.C. § 3103a(b)(2).

Identification of cellular devices used by the **target subject** by the methods described herein will begin within ten (10) days of the date of issuance of the requested Warrant and Order.

The investigative agency(ies) will make no affirmative investigative use of any identifiers collected from cellular devices other than the target cellular device(s), except to identify the target cellular device(s) used by the **target subject** and distinguish it from the other cellular devices. Once investigators ascertain the identity of the target cellular device(s), they will end the collection, and any information collected concerning cellular devices other than the target cellular device(s) will be deleted.

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri

| | |
|---|---|
| In the Matter of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>the Use of a Cell-Site Simulator to Identify the Cellular<br>Device(s) Used by DEMETRIUS JOHNSON. | )<br>)<br>)   Case No.   4:18 MJ 7022 SPM<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ Missouri _____ *(identify the person or describe the property to be searched and give its location)*:

the Use of a Cell-Site Simulator to Identify the Cellular Device(s) Used by DEMETRIUS JOHNSON.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

see "Attachment A."

**YOU ARE COMMANDED** to execute this warrant on or before _____ February 20, 2018 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.      ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to   Honorable Shirley P. Mensah, U.S. Magistrate Judge   .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☑ until, the facts justifying, the later specific date of   08/07/2018   .

Date and time issued:   2.7.2018; 16:30                                   _____
                                                                                                    *Judge's signature*

City and state:      St. Louis, Missouri                        Honorable Shirley P. Mensah, U.S. Magistrate Judge
                                                                                           *Printed name and title*

**ATTACHMENT A**

PURSUANT TO AN INVESTIGATION OF:

**DEMETRIUS JOHNSON (DOB: 5/23/1994; SSN: XXX-XX-8920)** (hereinafter the "**target subject**")

for violations of Title 21, United States Code, Section(s) 841(a)(1) and 846 (hereinafter the "subject offense(s)"), the Warrant authorizes the Federal Bureau of Investigation and other authorized federal/state/local law enforcement agencies (hereinafter referred to as "investigative agency(ies)") to use an electronic surveillance technique, that being a cell-site simulator (hereinafter "cell-site simulator") for a period of forty-five (45) days following the issuance of the Warrant i.e., from February 7, 2018, to March 23, 2018, 11:59 p.m. (CT), at all times of day and night, to determine the electronic identifying numbers of any cellular device(s) (hereinafter referred to as the "target cellular device(s)") used by the **target subject** by collecting radio signals, including the unique identifiers, emitted by the target cellular device(s) and other cellular devices in its vicinity, when the investigative agency(ies) have reason to believe that the **target subject** is present.

The Warrant does not authorize the interception of any telephone calls, text messages, or other electronic communications, and the Warrant prohibits the seizure of any tangible property. The Court finds reasonable necessity for the use of the technique authorized above. See 18 U.S.C. § 3103a(b)(2).

Identification of cellular devices used by the **target subject** by the methods described herein will begin within ten (10) days of the date of issuance of the requested Warrant and Order.

The investigative agency(ies) will make no affirmative investigative use of any identifiers collected from cellular devices other than the target cellular device(s), except to identify the target cellular device(s) used by the **target subject** and distinguish it from the other cellular devices. Once investigators ascertain the identity of the target cellular device(s), they will end the collection, and any information collected concerning cellular devices other than the target cellular device(s) will be deleted.