UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  S1-4:18 CR 565-1 CDP (JMB) |
| | ) | |
| DEMETRIUS TYRESE JOHNSON, | ) | Defendant No. 1 |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**[1]

Currently before the Court are several pretrial motions filed on behalf of Defendant

Demetrius Johnson.[2]  The government opposes each motion.  The pending motions are

summarized as follows:

1.     Motion to suppress statements made on July 18, 2018 (ECF No. 574);

2.     Motion to suppress physical evidence seized on July 18, 2018 (ECF No. 583);

3.     Motion to suppress cell-site simulator evidence (ECF No. 584);

4.     Motion to compel the government to provide access to alleged victim's computer and to disclose data and information relating to the use of a cell-site simulator (ECF No. 585);

5.     Motion to compel the government to disclose its trial experts (ECF No.

---

[1] Pretrial matters in this case have been referred to the undersigned United States Magistrate Judge, under 28 U.S.C. § 636(b).

[2] In earlier court documents, the undersigned has referred to this defendant as Demetrius Johnson to differentiate him from his brother and co-defendant Bruce Johnson.  Because Bruce Johnson has pleaded guilty and no longer has any pretrial motions pending, the undersigned will refer to this defendant simply as "Johnson."

586); and

6.     Motion to compel the government to provide early notice of evidence it intends to introduce pursuant to Fed. R. Evid. 404(b).

## INTRODUCTION AND RELEVANT PROCEDURAL BACKGROUND

The Superseding Indictment in this case alleges a large-scale drug trafficking conspiracy involving numerous defendants.  The Indictment also alleges other crimes including money laundering, firearms offenses and a murder.  The discovery is voluminous, detailed, and complex.  As such, the Court scheduled pretrial motions in phases.  The first phase covered legal motions that would not require evidentiary hearings to resolve.  The second phase covered electronic surveillance issues, such as issues related to wiretap orders.  The third phase covered any remaining suppression motions, discovery motions, and severance motions.  Johnson's current motions were filed pursuant to the third and final phase of pretrial motions.

Johnson was charged in four counts of the Superseding Indictment.  Count I charged Johnson with conspiracy to distribute fentanyl, in violation of 21 U.S.C. § 846.  Count II charged him with distribution of fentanyl, resulting in the death of a person referred to as J.W., in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(C).  Count III charged him with possessing a firearm in furtherance of a drug trafficking crime and during the course of that violation a person was murdered, in violation of 18 U.S.C. § 924(c) and 924(j).[3]  Count XVI charged him with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g).[4]

On January 6, 2020, the Court held an evidentiary hearing on Johnson's pending motions.

---

[3] Although Count III alleged a death-eligible offense, the government later filed a formal notice that it will not seek a death penalty in this matter.  (See ECF No. 440)

[4] The government later dismissed Count XVI without prejudice.  (See ECF Nos. 467, 472)

Johnson was present with his attorneys, Justin Gelfand and William Margulis; the government was represented by AUSAs Angie Danis and Lisa Yemm.  The government offered the testimony of three witnesses:  St. Louis Metropolitan Police Department ("SLMPD") Detective Michael Betz; SLMPD Officer Larry Wentzel; and FBI Special Agent Andrew Frank.  (See ECF No. 672)  The government also introduced numerous exhibits, including relevant search warrant documents; photographs taken during the execution of a search warrant; an audio/video recording of a custodial interview of Johnson on July 18, 2018; and an Advice of Rights form from July 18, 2018.  (See ECF No. 671)  Defense counsel cross-examined each witness extensively.  At the conclusion of the hearing, the parties requested leave to obtain a transcript of the hearing and file post-hearing memoranda.

Based on the testimony and evidence adduced at the evidentiary hearing, having had the opportunity to observe the demeanor and evaluate the credibility of the witness, and having fully considered the exhibits and the parties' arguments and written submissions, the undersigned makes the following findings of fact, conclusions of law, and recommendations.

## FINDINGS OF FACT

The following findings of fact are generally organized chronologically and separated into sections based on Johnson's pending suppression motions.

### A.   Cell-Site Simulator Warrant

Michael Betz is a detective with the St. Louis Metropolitan Police Department ("SLMPD") with about 18 years of experience.  Det. Betz is also a Special Federal Officer with the Federal Bureau of Investigation ("FBI").

On February 7, 2018, Det. Betz appeared before the Honorable Shirley P. Mensah, United States Magistrate Judge for this District, and submitted an Affidavit in support of an

Application for a Search Warrant authorizing "the Use of a Cell-Site Simulator to Identify the Cellular Device(s) used by DEMETRIUS JOHNSON."  (Gov't Exhs. 2a, 2b)[5]  Among other things, the Affidavit described the drug trafficking investigation and the use of cell phones.  The Affidavit also described in considerable detail how a cell-site simulator would be used to identify cell phones used by Johnson.  In particular, paragraphs 46-48 described the unique signals and identifiers to be seized and how those identifiers would be used to identify Johnson's cell phone(s) as follows:

> 46.    To facilitate execution of the requested warrant, the investigative agency(ies) and I seek to use an investigative device known as a cell-site simulator that sends signals to nearby cellular devices, including the cellular devices used by [Johnson].… [I]f authorized by the warrant that is being requested the investigative agency(ies) intend to employ a cell-site simulator, to detect radio signals that are emitted automatically at the time a cellular telephone is turned on, and periodically thereafter as long as the phone remains on, regardless of whether a call is being made, to communicate with the cellular infrastructure, including cell towers.  The cell-site simulator sends signals to nearby cellular devices, including the cellular device(s) used by [Johnson], and in reply, nearby cellular devices will broadcast signals that include unique identifiers.  These signals contain identifying numbers for the telephone (e.g., the telephone number, Electronic Serial Number ("ESN"), or International Mobile Subscriber Identification ("IMSI") number).
>
> 47.    The investigative agency(ies) intend to send signals in the vicinity of [Johnson] to connect with any cellular device(s) used by [Johnson] that will cause it, and non-target phones on the same provider network in close physical

---

[5] The Application also included a separate request for authorization to use a pen register and trap-and-trace device ("pen-trap device").  This separate application was signed by AUSA Angie Danis.  As outlined AUSA Danis's application, cell site simulators fall within the statutory definition of a pen-trap devices.  (See Gov't Exh. 2a Bates No. GOV 0001580)  By statute, pen-trap applications must normally be submitted to a judge and signed by "an attorney for the Government" under penalty of perjury.  See 18 U.S.C. § 3122(b).  The statutory rules authorizing courts to issue pen-trap orders do not require a showing of probable case.  Rather, § 3122 requires only that the applicant certify that "the information likely to be obtained is relevant to an ongoing criminal investigation." § 3122(b)(2); see also Smith v. Maryland, 442 U.S. 735 (1979) (holding that installation and use of a pen register was not a Fourth Amendment search).  In this case, however, the application was accompanied by a request for a warrant pursuant to Rule 41, providing an additional layer of constitutional protection because it arguably remains an open question whether the use of a cell site simulator to identify a phone number constitutes a "search" for Fourth Amendment purposes.

proximity, to emit unique identifiers, which will be obtained by the technology. The investigative agency(ies) will use the information collected to determine the currently unknown identifiers of the cellular device(s) being used by [Johnson]. By employing the technique at two or more locations, through the process of elimination, the investigative agency(ies) can isolate the ESNs or IMSIs corresponding to the specific cellular device(s) used by the target subject, even if the cellular device(s) is located in a house, apartment, building, or other private space. The investigative agency(ies) do not seek, and the cell-site simulators does not intercept, the content of any telephone calls, text messages or electronic communications.

48.     The investigative agency(ies) will use the cell-site simulator when they have reason to believe [Johnson] is present. Investigative agency(ies) will collect the identifiers emitted by cellular devices in the immediate vicinity of the target cellular device(s) when [Johnson] is in multiple locations and/or multiple times at a common location. Through the process of elimination the investigative agency(ies) will use this information to identify the target cellular device(s), because only the target cellular device(s) unique identifiers will be present in all or nearly all locations.

(Id.)

At the evidentiary hearing, Det. Betz testified that, apart from his Affidavit, no other factual information was provided to Judge Mensah. Both Det. Betz and Judge Mensah signed the Affidavit and Application. Judge Mensah issued the warrant authorizing the use of the cell-site simulator at 16:30 on February 7, 2018. (Gov't Exh. 2c) The face of the warrant identified the person or property to be searched as follows: "the Use of a Cell-Site Simulator to identify the Cellular Devices Used by DEMETRIUS Johnson." (Gov't Exh. 2c at 1) Attachment A to the search warrant identified Johnson as the "target subject" of the warrant by his name, date of birth, and the last four digits of his Social Security Number. It also described how the cell-site simulator would be used and what would be gathered. More specifically, Attachment A stated that –

the Warrant authorizes the Federal Bureau of Investigation and other authorized … law enforcement agencies (hereinafter referred to as "investigative agency(ies)") to use an electronic surveillance technique, that being a cell-site simulator (hereinafter "cell-site simulator") for a period of forty-five (45) days following the issuance of

5

the Warrant i.e., from February 7, 2018, to March 23, 2018, 11:59 p.m. (CT), at all times of day and night, to determine the electronic identifying numbers of any cellular device(s) (hereinafter referred to as the "target cellular device(s)") used by [Johnson] by collecting radio signals, including the unique identifiers, emitted by the target cellular device(s) and other cellular devices in its vicinity, when the investigative agency(ies) have reason to believe that [Johnson] is present.

(Id. at 2)

Attachment A to the warrant also included certain procedures to limit the use of information gathered from persons other than Johnson.  In particular, Attachment A noted that –

[t]he investigative agency(ies) will make no affirmative investigative use of any identifiers collected from cellular devices other than the target cellular device(s), except to identify the target cellular device(s) used by [Johnson] and distinguish it from the other cellular devices.  Once investigators ascertain the identity of the target cellular device(s), they will end collection, and any information concerning cellular devices other than the target cellular device(s) will be deleted.

(Id.)

Detective Betz testified that, although he was present when the cell-site simulator was used, he is not trained to operate such a device.  In this case, DEA agent Gary Thiedig operated the cell-site simulator.  Det. Betz testified that the device was used at multiple locations.

On February 21, 2018, Det. Betz filed a Report and Return for the cell-site simulator warrant which reflects the following facts:  (1) the warrant was issued at 1630 on February 7, 2018; (2) it was first deployed at 0630 on February 8, 2018; and (3) agents terminated using it at 12:00 p.m. on February 8, 2018.  (Gov't Exh. 2d)  Det. Betz testified that he used the return form he believed to be required and that he also prepared a separate report[6] regarding the use of the cell-site simulator but that report was not filed with the Return.

**B.    Search of 1264 Grant Drive, St. Louis, MO, and Seizure of Cell Phone**

Johnson was initially charged in a suppressed indictment returned on June 28, 2018.  On

---

[6] Detective Betz identified that report as an FBI "302."

July 18, 2018, Det. Betz and other officers conducted a "roundup" operation to arrest Johnson and numerous co-defendants.  On July 16, 2018, in apparent anticipation of the roundup, Det. Betz appeared before the undersigned and applied for numerous search warrants directed at locations associated with Johnson and several co-defendants.  (Gov't Exhs. 3a-3c)  Det. Betz submitted a 200-plus page omnibus Affidavit in support of separate warrants for each of the specifically identified locations.  (Gov't Exhs. 3a, 3c)  Location #1 was 1264 Grant Drive, St. Louis County, MO 63132.  (Gov't Exh. 3c at 14).  The Affidavit included a photograph of 1264 Grant Drive and represented that 1264 Grant Drive was the primary residence of Johnson and Ashley Dickerson (a co-defendant in the Indictment).  The Affidavit indicated that the investigators believed that Johnson stored firearms, as well as proceeds and records related to drug trafficking at the residence.  (See id. at 14-15)

Det. Betz signed the Affidavit, and at 3:10 p.m., the undersigned issued a warrant authorizing the search of 1264 Grant Drive.  The warrant described the property to be searched as follows:

> **Location #1 – 1264 Grant Drive, St. Louis County, Missouri 63132. Location #1** is a singled story residence constructed of brick and siding.  The residence has a small concrete porch in front of the entrance with a white fence surrounding it.  The front door of the residence is white in color and faces west. The numerics "1264" are affixed to a post, located at the southwest corner of the front porch.

(Gov't Exh. 3b at 1)  The warrant reflects a finding of probable cause to search 1264 Grand Drive for items more fully described on an attached "List."  (Gov't Exh. 3b)  Johnson does not challenge the particularity of the attached List, which, broadly speaking, identified items commonly associated with drug trafficking (e.g., controlled substances, cellular telephones, currency, and firearms).  (Gov't Exh. 3b at 2)  The warrant does not mention automobiles located at the residence.  From the record before the Court, it does not appear that Det. Betz participated

7

in the search of 1264 Grant Drive.

Larry Wentzel is an officer with the SLMPD with about eight years of experience.  In July 2018, he was assigned to the south patrol of the first district.  Det. Wentzel previously worked in a unit that specialized in drug investigations.  Officer Wentzel was assigned to assist in executing the search warrant at 1264 Grant Drive, during the early morning on July 18, 2018. Officer Wentzel testified that he participated in a briefing before the warrant was executed and that he briefly reviewed the search warrant.  He testified that Detective Thomas Strode conducted the briefing and that Det. Strode advised him that Demetrius Johnson and Ashley Dickerson lived at 1264 Grant Drive.  Officer Wentzel further testified that he was advised to look for firearms, narcotics, drug ledgers, cell phones, drug paraphernalia, and other items related to drug trafficking.  Officer Wentzel testified that he did not recall being advised about vehicles during the briefing.

Officer Wentzel testified that a SWAT team conducted the initial entry into 1264 Grant Drive.  When Officer Wentzel entered, Johnson, Dickerson and some juveniles were present. Officer Wentzel testified that the only driving-age persons present were Johnson and Dickerson. Officer Wentzel explained that there was a driveway associated with the residence, with two cars parked on that driveway.

Officer Wentzel testified that he searched the basement as well as a white Hyundai SUV that was parked in the driveway.  Inside the basement, he found a loaded magazine for a weapon, which he gave to Det. Strode to seize.[7]  Officer Wentzel seized a flip-style cell phone from the Hyundai SUV.  Government Exhibits 3d-7 and 3d-8 depict the Hyundai and a cell phone on a

---

[7] The government offered into evidence several photographs taken in connection with the execution of the search at 1264 Grant Drive.  (See Gov't Exhs. 3d-2 through 3d-8)

passenger seat of the Hyundai as Officer Wentzel found it during the search on July 18, 2018.

Officer Wentzel testified that he could see the cell phone through a window on the Hyundai and that, based on his experience, he knew that flip phones are commonly used to facilitate drug trafficking.

The record before the Court supports a finding that the members of the drug trafficking conspiracy, including Johnson, used cell phones extensively in connection with that conspiracy. For example, and as outlined in an earlier Memorandum from the undersigned in this matter (see ECF No. 534) investigators obtained a first Title III wiretap order in late 2017, and by mid-June 2018 they had obtained wiretap orders for approximately twelve different phone numbers, including phones used by Johnson.

### C.      Johnson's Post-Arrest Statements

Johnson was arrested on July 18, 2018.  Andrew Frank is a Special Agent with the FBI with about four years of experience.  SA Frank participated in a post-arrest interview of Johnson. Also participating was Det. Strode.  The entire interview was audio and video recorded and was submitted as Government's Exhibit 4 to the evidentiary hearing.  The recording lasts about 14 minutes.[8]

Government's Exhibit 4a is a copy of a DEA Advice of Rights form.  The form is dated July 18, 2018, with a time of 11:16 a.m.  SA Frank testified that Johnson was read his rights from that form.  The top part of the form conveys the requisite Miranda rights under the heading "YOUR RIGHTS."  (Id.)  The middle of the form includes the heading "WAIVER OF RIGHTS."  "D. Johnson" signed below the waiver indicating that he had read his rights, that

---

[8] The undersigned offered to play the recording as part of the hearing or to review the recording after the hearing in connection with deciding Johnson's Motion to Suppress Statements.  The parties agreed not to play the recording during the hearing.

someone else had also read those rights to him, that he understood his rights, and that he was

"willing to freely and voluntary answer questions without a lawyer present."  (Id.)  The form was

also signed by Det. Strode and SA Frank.

      During cross-examination, SA Frank was asked whether Johnson invoked his right to

remain silent during the interview.  SA Frank testified that Johnson "gestured at one point,"

which SA Frank took to mean "skepticism."  (Tr. at 56-57)

      The undersigned has reviewed and considered the entire recorded interview.  At the

outset of the recording, Johnson, SA Frank and Det. Strode entered an interview room.  Johnson

was not restrained.  Before conducting any questioning, Det. Strode verbally advised Johnson of

his Miranda rights from a form.  Johnson verbally acknowledged that he understood each right.

When asked if he wanted to speak with the investigators, Johnson said nothing but made a minor

side-to-side head turn.  In response, Det. Strode asked, "you don't want to talk to us at all? … Do

you want us to let you know what's going on?"  Johnson indicated that he wanted the

investigators to explain the situation to him.

      Thereafter, Det. Strode told Johnson that the investigators had wiretapped Johnson's

phones.  Det. Strode advised Johnson that he was charged in a conspiracy and that gun charges

would be added.  He next advised that Johnson and others were connected to a 2016 murder.

Johnson asked Det. Strode to explain the murder charge to him, and Det. Strode advised that

Johnson provided a gun used by Calvin.  Det. Strode advised Johnson that he was looking at a

mandatory minimum 20-year sentence.

      The foregoing all occurred within about the first 3:15 minutes of the recording.  At about

that point, Det. Strode realized that he had not asked Johnson to sign the Advice of Rights form.

The video depicts Johnson taking a fair amount of time to read the form and then signing the

form and returning it to Det. Strode at about the 3:57 minute mark of the recording.

Detective Strode offered to play some of the recorded phone calls for Johnson.  Johnson indicated that he wanted to hear some calls.  Det. Strode played two recordings.  The persons talking on the second recorded call discussed a "white boy" who overdosed.  About two minutes into that audio recording, Johnson made a hand gesture and Det. Strode confirmed that Johnson wanted him to stop the recording.  Det. Strode stopped the recording and advised Johnson that he would also be charged with the overdose death.

At about the 10:18 minute mark of the video, Johnson brought back up the subject of the murder charge.  In response, Det. Strode explained additional details for Johnson.  At about the 11:33 minute mark, Det. Strode asked Johnson if here was anything he wanted to discuss.  In response, Johnson stretched and uttered something that was not clear in the recording.  Johnson then asked Det. Strode how many houses the investigators hit that day.  Det. Strode advised that they searched 17 properties. He also told Johnson that they seized about $60,000 of Johnson's money from a safe, as well as guns and some fentanyl.  At about this point, Johnson stood up and uttered something else that was not clear, he moved toward the door, and the interview ended.

Throughout the entire recorded interview, very few substantive questions were posed to Johnson.  To the contrary, most of the interview either involved Det. Strode explaining the charges and evidence to Johnson and Johnson asking questions.  For example, Johnson asked how much trouble his girl (co-defendant Dickerson) was in.  Det. Strode forthrightly answered Johnson's questions.   At no time did the investigators apply any pressure or coercive techniques. Johnson appears sober, even headed, and fully in control of his ability to understand his situation and respond to the information provided to him by the investigators.

Johnson was not restrained during the interview.  He did not appear to be in any distress

or discomfort or in any manner unable to understand his circumstances.  No weapons were

drawn.  No threats or promises were made to Johnson.  At no time did anyone present raise their

voices.

Additional findings of fact are included in the following discussion.

## DISCUSSION, CONCLUSIONS OF LAW, AND RECOMMENDATION

**I.**    **Motion to Suppress Statements** (ECF No. 582)

Johnson argues that law enforcement violated his Miranda rights by continuing to

question him after he invoked his right to remain silent.  The government contends Johnson's did

not unequivocally invoke any rights.

**A.**    **Legal Principles – *Miranda* and Invocation of Right to Remain Silent**

Statements to law enforcement officers made during custodial interrogation are normally

subject to the procedures set out in Miranda v. Arizona, 384 U.S. 436, 477-78 (1966).  United

States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc).  Custodial interrogation means

questioning initiated by law enforcement officers after a person has been taken into custody …."

Illinois v. Perkins, 496 U.S. 292, 296 (1990) (citation and quotation omitted).  If, after being

given Miranda warnings, a defendant agrees to make a statement, the government must show that

the waiver was voluntary, knowing, and intelligent for the statements to be admissible at trial.

Colorado v. Connelly, 479 U.S. 157, 169-70, 174 (1986); North Carolina v. Butler, 441 U.S. 369,

373-76 (1979); Miranda, 384 U.S. at 444, 475.  "A statement is involuntary when it was

extracted by threats, violence, or express or implied promises sufficient to overbear the

defendant's will and critically impair his capacity for self-determination."  LeBrun, 363 F.3d at

724.  See also United States v. Mshihiri, 816 F.3d 997, 1004 (8th Cir. 2016) (quoting LeBrun);

United States v. Perry, 714 F.3d 570, 574 (8th Cir. 2013) (quoting LeBrun).  "[I]t is not enough

to show that the authorities' representations were the but-for cause of a confession." LeBrun, 363 F.3d at 724.  "To determine whether a statement is voluntary [the Court] examine[s] the totality of the circumstances, including the 'conduct of the officers and the characteristics of the accused.'" United States v. Williams, 793 F.3d 957, 962 (8th Cir. 2015) (quoting LeBrun, 363 F.3d at 724).

The Supreme Court has explained that "[d]uring an interrogation, '[i]f the individual indicates in any manner, at any time prior to or during the questioning, that he wishes to remain silent, the interrogation must cease.'" United States v. Adams, 820 F.3d 317, 322-23 (8th Cir. 2016) (quoting Miranda, 384 U.S. at 473-74).  Supreme Court cases after Miranda make clear, however, that the invocation of rights must be unequivocal and unambiguous.  See United States v. Davis, 512 U.S. 452 (1994) (invocation of right to counsel); Berghuis v. Thompkins, 560 U.S. 370 (2010) (invocation of right to remain silent).

Regarding the right to remain silent, the Eighth Circuit has consistently explained that "'[t]o adequately invoke this right and effectively cut off questioning, a suspect must indicate a clear, consistent expression of a desire to remain silent.'" Adams, 820 F.3d at 323 (quoting United States v. Johnson, 56 F.3d 947, 955 (8th Cir. 1995)).  Courts are to "consider the defendant's statements as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent." Id. (internal citation and quotations omitted).

**B.    Analysis**

At the evidentiary hearing, it was established that Johnson was arrested and in custody when he was questioned on July 18, 2018.  Therefore, Miranda applies.  The record also supports a finding that Det. Strode provided adequate Miranda warnings to Johnson, that Johnson verbally acknowledged that he understood his rights, and that Johnson voluntarily and intentionally

signed a written waiver of his <u>Miranda</u> rights.  (<u>See</u> Gov't Exh. 4a)  Further, the record supports a finding that Johnson was not threatened, mistreated, under the influence of drugs or alcohol, or coerced into making any statements.  The only issue the Court must decide is whether the investigators questioned Johnson after he unequivocally invoked his right to remain silent.

As noted in the findings of fact above, Det. Strode asked Johnson if he wanted to talk after he advised Johnson of <u>Miranda</u> rights.  Johnson did not respond verbally, but rather moved his head in a slight side-to-side manner.  The undersigned reviewed the video carefully and Johnson's nonverbal response was unclear and cannot be reasonably said to be an unequivocal invocation of the right to remain silent.

Significantly, Det. Strode took steps to clarify Johnson's gesture.  In response to Johnson's head movement, Det. Strode sought to confirm Johnson's intentions by asking whether Johnson did not want to talk at all and whether Johnson wanted the investigators to let him know more about the charges and the case against him.  In response, Johnson indicated that he wanted to hear more from the investigators.

On these facts, and in view of the entirety of the video recording of the interview and Johnson's conduct as a whole, <u>see</u> <u>Adams</u>, 820 F.3d at 323, the undersigned finds that Johnson's head movement was not an unequivocal invocation of the right to remain silent.  Det. Strode did not ignore the head gesture.  Instead, Det. Strode reasonably sought to confirm Johnson's desire and intentions and only continued to speak with Johnson after Johnson indicated that he wanted to continue the interview by having the investigators provide more details to him.  Finally, after Johnson made his head gesture, Det. Strode provided the Advice of Rights form to Johnson.  The video clearly shows that Johnson took time to review that form and he signed the portion of the form indicating:  (1) that he had read the advice of rights; (2) that someone read the advice of

14

rights to him; (3) that he understood what his rights were; and (4) that he was willing to freely and voluntarily answer questions without a lawyer present.  (Gov't Exh. 4, 4a).

The undersigned finds that Johnson did not unequivocally invoke his right to remain silent and, therefore, the investigators did not violate Johnson's <u>Miranda</u> rights.  Accordingly, the undersigned respectfully recommends that Johnson's motion to suppress statements be denied.

**II.** <u>**Motion to Suppress Evidence Seized July 18, 2018**</u> (ECF No. 583)

On July 16, 2018, in anticipation of an arrest "round up" of many of the co-defendants charged in this matter, Det. Betz applied for and obtained a search warrant for Johnson's residence at 1264 Grant Drive.  Johnson contends that the affidavit submitted with the warrant application lacked probable cause, therefore any evidence seized must be suppressed.  Johnson also contends that the officers executing the warrant seized a flip-style cell phone from a car in the driveway of the residence and the warrant did not authorize a search of that car.  Therefore, independent of any concerns regarding probable cause to issue the search warrant, evidence associated with the flip phone must be suppressed.

The government counters that the warrant was supported by probable cause and that, even if the car was not covered by the warrant, the flip phone was seized pursuant to the plain view and automobile exceptions to the Fourth Amendment's warrant requirement.

**A.** <u>**Legal Principles – Review of Search Warrants**</u>

"Issuance of a search warrant must be supported by probable cause, which depends on whether, under the totality of the circumstances, there is a fair probability evidence of a crime will be found in a particular place."  <u>United States v. Faulkner</u>, 826 F.3d 1139, 1144 (8th Cir. 2016) (citing <u>United States v. Rodriguez</u>, 711 F.3d 928, 936 (8th Cir. 2013)).  <u>See</u> also <u>Johnson v. United States</u>, 333 U.S. 10 (1948); <u>Warden v. Hayden</u>, 387 U.S. 294 (1967); <u>United States v.</u>

Keys, 721 F.3d 512, 518 (8th Cir. 2013); Fed. R. Crim. P. 41.  Probable cause is "a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."  Illinois v. Gates, 462 U.S. 213, 232 (1983). Probable cause may be found in hearsay statements from reliable persons, Gates, 462 U.S. at 245; in hearsay statements from confidential informants corroborated by independent investigation, Draper v. United States, 358 U.S. 307, 313 (1959); or in observations made by trained law enforcement officers, McDonald v. United States, 335 U.S. 451, 454 (1948).  While these are some of the common ways in which probable cause is established, they are not all-inclusive.

Information contained in applications and affidavits for search warrants must be examined in the totality of the circumstances presented.  Gates, 462 U.S. at 230.  It is well-established that, when the issuing judge relies on the supporting affidavit to issue a search warrant, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause."  United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (citations and quotations omitted); see also United States v. Farlee, 757 F.3d 810, 819 (8th Cir. 2014); United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995).  After a judicial officer has issued a warrant upon a finding of probable cause, that finding normally deserves great deference.  Gates, 462 U.S. at 236.  Thus, "[t]he affidavit should be examined under a common sense approach and not in a hypertechnical fashion."  Solomon, 432 F.3d at 827 (citation and quotations omitted).  See also United States v. Ventresca, 380 U.S. 102, 109 (1965); Gladney, 48 F.3d at 312 (explaining that "[a]ffidavits must be read in a common-sense and realistic fashion") (citations and quotations omitted).  Therefore, "[w]hen reviewing the issuance of a warrant, [this court] afford[s] great deference to the issuing judge's probable-cause

determination, ensuring only that the judge had a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing." United States v. Petruk, 929 F.3d 952, 959 (8th Cir.) (citations and quotations omitted; emphasis supplied), cert. denied, 140 S. Ct. 510 (2019); see also United States v. Daigle, 947 F.3d 1076, 1081 (8th Cir. 2020) (citations and quotations omitted).

"Where probable cause depends upon information supplied by an informant, '[t]he core question … is whether the information is reliable.'" Keys, 721 F.3d at 518 (quoting United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993)). "[T]he informant's 'reliability, veracity, and basis of knowledge are relevant considerations—but not independent essential elements—in finding probable cause.'" Faulkner, 826 F.3d at 1144 (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). The reliability of the information "can be established through independent corroboration or the informant's track record of providing trustworthy information." Id. (citing Williams, 10 F.3d at 593); see also Keys, 721 F.3d at 518. "If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." Keys, 721 F.3d at 518 (quoting Williams, 10 F.3d at 593). "[I]t is well established that even the corroboration of minor, innocent details can suffice to establish probable cause." Id. (quoting United States v. Rodriguez, 711 F.3d 928, 936 (8th Cir. 2013)).

### B.   Analysis – Search Warrant for 1264 Grant Drive

Johnson offers several arguments why the warrant for his residence lacked probable cause. These arguments amount to a "divide-and-conquer approach," and Johnson does not address probable cause in view of the entire Affidavit. See Gates, 462 U.S. at 230; United States

v. Brackett, 846 F.3d 987, 992 (8th Cir.) ("Whether probable cause to issue a search warrant has been established is determined by considering the totality of the circumstances….") (citations and internal quotations omitted), cert. denied, 137 S. Ct. 2177 (2017).

First, Johnson notes that Det. Betz's Affidavit relies, in part, on information from several confidential sources and that one of those sources reportedly told law enforcement that Johnson stored drug proceeds at his residence.  Without citation to authority, Johnson argues that, because no proceeds were recovered during the search, the information from at least one of the confidential sources was false and provided no probable cause to support the warrant.  This argument cannot be sustained.  The Court is bound to look at the four-corners of the Affidavit— what was or was not found during the search is not a basis to revisit the issue of probable cause. See Farlee, 757 F.3d at 819.

Johnson next argues physical surveillance at the residence revealed only that Johnson lived there and that is not enough to establish probable cause.  Again, Johnson's argument ignores the totality of the circumstances presented in Det. Betz's Affidavit.  Where Johnson lived is relevant.  Surveillance confirming Johnson's residence would add to the totality of relevant facts and circumstances, especially in this Affidavit which described a large drug trafficking conspiracy and specific conduct attributable to Johnson.

Next, Johnson takes issue with a passage in the Affidavit that excerpted a recorded conversation between co-defendant Pipes and Johnson.  In his Affidavit, Det. Betz characterized this conversation as Pipes asking Johnson to bring him rifle ammunition and that Johnson had ammunition at his residence.  Johnson contends that this characterization merely reflects Det. Betz's gut instinct.  Johnson's argument again fails to address the entirety of the Affidavit.  The undersigned finds that Det. Betz's interpretation of the Pipes-Johnson conversation reflects a

valid and reasonable interpretation.  See Brackett, 846 F.3d at 992 ("Not only may an issuing

judge draw reasonable inferences from the totality of the circumstances in determining whether

probable cause exists to issue a warrant, … law enforcement officers may make reasonable

inferences in preparing affidavits in support of a warrant.") (citations and internal quotations

omitted).  Det. Betz's interpretation of the conversation, when viewed in the context of the

Johnson's drug trafficking activities summarized in the Affidavit, reflects much more than mere

gut instinct.  Cf. also United States v. Dickerman, -- F.3d --, 2020 WL 1501963 at *4 (8th Cir.

Mar. 30, 2020) (in assessing probable cause as part of the Leon good-faith inquiry, explaining

that a affiant's conclusion was not made "in isolation," but was supported in the context of other

detailed facts in the affidavit).

      At a minimum, Det. Betz's Affidavit supports the following facts specific to this case:

(1) there was a large and on-going drug trafficking conspiracy; (2) Johnson was a significant

member of that drug trafficking conspiracy; (3) co-defendant Dickerson was a member of the

drug trafficking conspiracy; (4) both Johnson and Dickerson lived at 1264 Grant Drive; (5) the

conspiracy involved the use of cell phones and communications between members; and (6)

members of the conspiracy, including Johnson, were involved in acts of violence including a

murder (see Affidavit at 199).  The Affidavit also included information regarding vehicles driven

by Johnson and observing Johnson in a specific vehicle at both his residence (1264 Grant) and at

1530 Lafayette while conducting a suspected narcotics transaction (see id. at 43-44).  The

Affidavit further included specific facts tying Johnson personally to an overdose death (see id. at

198-99).  The Affidavit further outlined circumstances to support a conclusion that Johnson and

Dickerson financed their lifestyles through drug sales (see id. at 200-01).  Finally, the Affidavit

also included more general allegations applicable to many large drug trafficking activities.  For

example, in his Affidavit Det. Betz noted that, based on his investigative team's experience, "large-scale narcotics traffickers commonly must maintain on hand large amounts of … currency … and often said currency in a residence under their control."  (Gov't Exh. 3c at 203)  Det. Betz listed similar items of evidentiary value that drug traffickers often keep in their residence such as, for example, notes and ledgers.  (Id.)

Based on the nature of the conspiracy and specific conduct described in the Affidavit that involved Johnson, Dickerson, and their shared residence, as well as the allegations applicable to drug traffickers in general, the facts summarized Det. Betz's affidavit provide more than a substantial basis to conclude that evidence of the drug trafficking conspiracy would be found at 1264 Grant Drive.  See United States v. Mazzulla, 932 F.3d 1091, 1098 (8th Cir. 2019) (explaining that probable cause findings are not disturbed on review unless there was "no substantial basis for that finding") (internal quotations and citations omitted).

Therefore, the undersigned respectfully recommends that the Court deny Johnson's motion to suppress evidence to the extent he contends that the Det. Betz's Affidavit failed to provide probable cause to support the issuance of a search warrant for 1264 Grant Drive.

### C.   Analysis – Seizure of Cell Phone from Car in Driveway

Johnson also asks the Court to suppress evidence related to the seizure of a flip phone from a car parked in the driveway at 1264 Grant Drive.  For purposes of deciding this issue, the undersigned assumes that Johnson has standing to challenge the search of the car.  The undersigned will also assume that the warrant authorizing the search of the residence located 1264 Grant Drive did not authorize a search of vehicles that happened to be present on the driveway associated with the residence.[9]  Instead, the undersigned will consider whether the

---

[9] The warrant for 1264 Grant Drive specifically references the residence and does not

phone was lawfully seized pursuant to a recognized exception to the Fourth Amendment's warrant requirement.

"The Supreme Court has declared that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" United States v. Aguilera, 625 F.3d 482, 486 (8th Cir. 2010) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); see also United States v. Blaylock, 535 F.3d 922, 926 (8th Cir. 2008) ("Generally, a warrant is required to ensure a search's reasonableness.") (citation omitted). The automobile exception is one of the well-delineated exceptions to the warrant requirement. See Aguilera, 625 F.3d at 486; see also Carroll v. United States, 267 U.S. 132, 159-62 (1925); United States v. Daniel, 809 F.3d 447, 448- 49 (8th Cir. 2016). Under that exception, "[p]robable cause to believe that an automobile contains contraband or evidence of criminal activity has long been held to justify a warrantless search of the automobile and seizure of the contraband." United States v. Shackleford, 830 F.3d 751, 753 (8th Cir. 2016) (citations omitted).

Regarding probable cause to conduct a search, the Eighth Circuit has explained that –

A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present. This practical and common-sensical standard is based on the totality of the circumstances. The test for probable cause is not reducible to precise definition or quantification, and finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence have no place in the probable-cause decision. All that is required is the kind of fair probability on which reasonable and prudent people, not legal technicians, act.

---

refer to the "premises" at 1264 Grant Drive. Had the warrant referred to "premises," the warrant would most likely have provided authority to search vehicles parked on the premises. See United States v. Gamboa, 439 F.3d 796, 807 (8th Cir. 2006); see also United States v. Montgomery, 527 F.3d 682, 687 (8th Cir. 2008).

United States v. Zamora-Garcia, 831 F.3d 979, 983 (8th Cir. 2016) (cleaned up); see also

Shackleford, 830 F.3d at 753.

"It is [also] well established that under certain circumstances the police may seize

evidence in plain view without a warrant." Coolidge v. New Hampshire, 403 U.S. 443,465

(1971). See also Horton v. California, 496 U.S. 128, 130 (1990) (clarifying Coolidge and

explaining that discovery by inadvertence is not necessary to justify a plain view seizure). "An

object may be seized by the police without a warrant under the plain view doctrine if '(1) the

officer did not violate the Fourth Amendment in arriving at the place from which the evidence

could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3)

the officer has a lawful right of access to the object itself.'" United States v. Vinson, 805 F.3d

1150, 1152 (8th Cir. 2015) (quoting United States v. Collins, 321 F.3d 691, 694 (8th Cir. 2003)).

Viewing the interior of a vehicle, without entering it, does not constitute a search which would

violate the Fourth Amendment. Id. Therefore, if a police officer observes evidence while

looking into a vehicle, the officer may lawfully seize that evidence without a warrant under the

plain view doctrine. Id.

The testimony and evidence before the Court support a finding that the white Hyundai

was parked in the driveway of the residence at 1264 Grant Drive. Officer Wentzel credibly

testified that he looked into the interior of the white Hyundai and observed a flip phone. Officer

Wentzel and the investigation team were lawfully present at 1264 Grant Drive and, therefore,

Officer Wentzel committed no Fourth Amendment violation when he looked through the

window of the Hyundai and observed the flip phone.[10] Officer Wentzel and the investigative

------

[10] Although "[t]he Supreme Court recently refused to extend the automobile exception to
the warrantless search of a vehicle parked in a portion of a driveway that is part of the
residence's curtilage…. [Johnson's] case has an additional fact of controlling significance."

team were well aware that the drug trafficking conspiracy at issue involved the use of numerous cell phones, including flip phones.  Therefore, the incriminating nature of the flip phone was immediately apparent.

Armed with knowledge of the flip phone inside the white Hyundai, Officer Wentzel had probable cause to conclude that evidence related to the crimes under investigation—drug trafficking—would likely be found in the flip phone.  Accordingly, under the automobile and plain view exceptions, Officer Wentzel could lawfully search the Hyundai and seize the flip phone without a warrant.

The undersigned recommends that the Court deny Johnson's motion to suppress evidence seized from the white Hyundai SUV on July 18, 2018.

### III.    Motion to Suppress Evidence Derived from Cell-Site Simulator (ECF No. 584)

The investigators in this matter obtained a warrant authorizing the use of a cell-site simulator to identify unknown cell phone(s) Johnson was using.  At the evidentiary hearing, the government agreed that this could be referred to as employing a cell-site simulator in "canvassing" mode (as opposed to using a cell-site simulator in "location" mode to locate a phone associated with a known phone number).  Johnson argues that the evidence must be suppressed.  Johnson's position is that the warrant was facially invalid because it failed to identify with particularity the property to be searched or the things to be seized.  Johnson also argues that the evidence should be suppressed because the warrant return did not comply with

---

United States v. Coleman, 909 F.3d 925, 931 (8th Cir. 2018) (distinguishing Collins v. Virginia, 138 S. Ct. 1663, 1669, 1671 (2018) and Florida v. Jardines, 569 U.S. 1 (2013)).  In Johnson's case, the officers were present at the Grant Drive residence pursuant to a valid search warrant. Therefore, any property interest Johnson had in the driveway and curtilage of his residence was not unconstitutionally compromised when Officer Wentzel looked through the window of the white Hyundai SUV.  See id. at 932.

Fed. R. Crim. P. 41.  Finally, Johnson argues that the evidence should be suppressed because of a violation of the pen register and trap-and-trace statute ( "pen-trap" statute).

The government contends that Defendant's arguments are hypertechnical; that any problem with the return would not require suppression.

A.    **Technical Context**

"When powered on, a cell phone is (among other things) a radio transmitter that automatically announces its presence to a cell tower or 'cell site' via a radio signal over a control channel which does not itself carry the human voice."  United States v. Bermudez, 2006 WL 3197181 at *6 (S.D. Ind. June 30, 2006) (citing In re application for Pen Register and Trap/Trace device with Cell Site Location Authority, 396 F.Supp.2d 747, 751 (S.D. Tex. 2005)).  Generally speaking, when on (and not in airplane mode) a cell phone "is constantly seeking the best reception," and checking for cell tower/site, "regardless of whether a call is made."  Id. (citing In re Application of U.S. for an Order Authorizing Installation and Use of a Pen Register and a Caller Identification System, 402 F.Supp.2d 597, 599 (D. Md. 2005)).  Cell phones are designed to seek, identify, and connect with the cell tower having the best signal in the area.  See Jones v. United States, 168 A.3d 703, 709 (D.C. App. Ct. Sept. 21, 2017) (describing cell phone technology in the context of cell-site simulators); see also United States v. Temple, 2017 WL 7798109 at *5-7 (E.D. Mo. Oct. 6, 2017) (describing cell-site simulators in context of phone location).

Although the government has not conceded that a warrant (or a warrant exception) is always required to deploy and use cell-site simulator technology, in September 2015, it promulgated guidance which requires federal agents to meet a probable cause standard, in most circumstances, in order to use "Cell Site Simulator Technology."  See Department of Justice

Policy Guidance:  Use of Cell Site Simulator Technology (Sept. 3, 2015),

http://www.justice.gov/opa/file/767321/download.  The Seventh Circuit has commented that,

assuming the Department of Justice Policy Guidance is accurate—

> Cell-site simulators ... function by transmitting as a cell tower. In response to the signals emitted by the simulator, cellular devices in the proximity of the device identify the simulator as the most attractive cell tower in the area and thus transmit signals to the simulator that identify the device in the same way that they would with a networked tower.
>
> A cell-site simulator receives and uses an industry standard unique identifying number assigned by a device manufacturer or cellular network provider.  When used to locate a known cellular device, a cell-site simulator initially receives the unique identifying number from multiple devices in the vicinity of the simulator.  Once the cell-site simulator identifies the specific cellular device for which it is looking, it will obtain the signaling information relating only to that particular phone.  When used to identify an unknown device, the cell-site simulator obtains signaling information from non-target devices in the target's vicinity for the limited purpose of distinguishing the target device.
>
> By transmitting as a cell tower, cell-site simulators acquire the identifying information from cellular devices.  This identifying information is limited, however.  Cell-site simulators provide only the relative signal strength and general direction of a subject cellular telephone; they do not function as a GPS locator, as they do not obtain or download any location information from the device or its applications.  Moreover, cell-site simulators used by the Department must be configured as pen registers, and may not be used to collect the contents of any communication, in accordance with 18 U.S.C. § 3127(3).  This includes any data contained on the phone itself:  the simulator does not remotely capture emails, texts, contact lists, images or any other data from the phone.  In addition, Department cell-site simulators do not provide subscriber account information (for example, an account holder's name, address, or telephone number).

United States v. Patrick, 842 F.3d 540, 542-43 (7th Cir. 2016) (emphasis supplied) (quoting

Department of Justice Policy Guidance:  Use of Cell Site Simulator Technology (Sept. 3, 2015)

at 2), cert. denied, 138 S. Ct. 2706 (2018).

### B.        Analysis – Validity of Cell-Site Simulator Warrant

Arguably, it remains an open question whether and under what circumstances law

enforcement must first obtain a search warrant to comply with the Fourth Amendment before

deploying a cell-site simulator to gather evidence in a criminal investigation.[11]  Our Court need not decide at this time whether the use of a cell-site simulator to identify a cellular device used by a known suspect requires a warrant.  Rather, in resolving Johnson's motion to suppress cell-site simulator evidence, the undersigned assumes that a warrant compatible with the Fourth Amendment was a prerequisite to deploying a cell-site simulator in this case.

As relevant to the pending motion to suppress cell-site simulator evidence, the government used a cell-site simulator to identify unknown cellular devices that Johnson was using in drug trafficking activities.[12]  On January 5, 2018, Det. Betz applied for and received a search warrant authorizing "the Use of a Cell-Site Simulator to Identify the Cellular Device(s) Used by Demetrius JOHNSON."  (Govt' Exh. 2a-2d; E.D. Mo. Case No. 4:18 MJ 7022 SPM)

The Fourth Amendment requires that search warrants be issued only upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  Dalia v. United States, 441 U.S. 238, 255 (1979) (internal quotations omitted).  In Dalia, the Supreme Court explained that valid warrants "require only three things."  Id.  "First, warrants must be issued by neutral, disinterested magistrates."  Id. (citations omitted).  Second, the warrant may issue only upon a showing of "probable cause to

---

[11] In Carpenter v. United States, 138 S. Ct. 2206, 2221 (2018), the Supreme Court decided the narrow question of whether compelling a provider to disclose a person's historical cell site location information constitutes a Fourth Amendment search, and, if so, whether the government must normally get a warrant to obtain such information.  The Court declined to express any view on other electronic surveillance matters.  Id. at 2220.
    The undersigned is aware of one reported decision that addresses the use of a cell-site simulator in "canvassing" mode to identify cellular devices used by a suspect.  See United States v. Tutis, 216 F.Supp.3d 467 (2016) (denying motion to suppress cell-site simulator evidence obtained pursuant to state warrant).

[12] As has been made clear in an earlier Report and Recommendation, the investigators in this case made extensive use of wiretaps to gather evidence against Johnson and numerous co-conspirators.  (See ECF No. 534)

believe that 'the evidence sought will aid in a particular apprehension or conviction' for a particular offense."  Id. (quoting Warden v. Hayden, 387 U.S. 294, 307 (1967)).  Third, the warrant "must particularly describe the things to be seized as well as the place to be searched." Id. (citations and quotations omitted).  Requiring particularity protects the citizens against general warrants.  See Coolidge v. New Hampshire, 403 U.S. 443, 467 (1972); see also Ashcroft v. Al-Kidd, 563 U.S. 731, 742-43 (2011) ("The principal evil of the general warrant was addressed by the Fourth Amendment's particularity requirement.").

Johnson does not challenge the neutral, disinterested magistrate and probable cause requirements.  Johnson contends that the warrant was invalid because it did not particularly describe the place to be searched and the things to be seized.

"The test for determining the sufficiency of the description of the place to be searched is whether the place to be searched is described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched."  United States v. Skarda, 845 F.3d 370, 377 (8th Cir. 2016) (citation and internal quotations omitted).  Further, if a court finds in hindsight that a warrant was overbroad, suppression may not be required.  See United States v. Szczerba, 897 F.3d 929, 938 (8th Cir. 2018) (concluding that, although warrant was lacking in particularity, it "was not so obviously deficient that any reasonable officer would have known that it was constitutionally fatal" and that application of the exclusionary rule on the facts "would not result in appreciable deterrence of police misconduct") (citations omitted), cert. denied, 139 S. Ct. 1544 (2019).

Rule 41 provides for two types of warrants—one for warrants for searching and seizing a person or property, see Rule 41(f)(1), and one for warrants for tracking devices, see Rule

41(f)(2).  The cell-site simulator warrant issued in this case presents a unique issue because it was not directed to physically searching a person, property, or location.  In this regard, it was more akin to a warrant for a tracking device.  Fed. R. Crim. P. 41(e)(2)(C) identifies the particularity requirements for tracking device warrants as follows:

> A tracking device warrant must identify the person or property to be tracked, designate the magistrate judge to whom it must be returned, and specify a reasonable length of time that the device may be used.  The time must not exceed 45 days from the date the warrant was issued….  The warrant must command the officer to:
>> (i) complete the installation authorized by the warrant within a specified time no longer than 10 days;
>> (ii) perform any installation authorized by the warrant during the daytime, unless the judge for good cause expressly authorizes installation at another time; and
>> (iii) return the warrant to the judge designated in the warrant.

While the cell-site simulator warrant in this case involved identification rather than tracking of cellular devices, it complied with the particularity requirements outlined in Rule 41(e)(2)(C).  Attachment A to the warrant identifies  the person or property as Johnson and cellular devices used by Johnson.  Attachment A also requires that the identification process begin within ten days of the issuance of the warrant.[13]  Attachment A further directs that the identification process may last no more than 45 days.  Finally, the cover sheet expressly authorizes the identification process to occur at any time, day or night.

The undersigned finds that the cell-site simulator warrant in this case satisfied the

---

[13] The warrant cover sheet indicates that that the warrant must be executed within 14 days.  That would be a violation of the 10-day limit included in Rule 41 for tracking devices.  This error does not have any impact in this case.  Attachment A included an express 10-day limit, and the evidence before the Court reasonably demonstrates that the agents actually began the identification process one day after receiving the warrant.  See also United States v. Nyah, 928 F.3d 694, 701 (8th Cir. 2019) ("The Fourth Amendment does not require that search and seizure warrants include expiration dates; the fourteen-day time limit … is a creature of federal rule.") (citing United States v. Burgess, 576 F.3d 1078, 1097 (10th Cir. 2009)).

relevant particularity requirements for the unique circumstances presented by the use of such devices to identify unknown telephone numbers.  Therefore, Johnson is not entitled to the suppression of any evidence obtained pursuant to the cell-site simulator warrant.

For purpose of completeness and to facilitate further review, the undersigned will also consider whether the cell-site simulator warrant identifies with particularity the person or property to be searched and the person or property to be seized apart from whether it complied with Rule 41 requirements for tracking devices.

The face of the warrant identifies the person or property to be searched as follows:  "the Use of a Cell-Site Simulator to identify the Cellular Devices Used by DEMETRIUS Johnson." (Gov't Exh. 2c at 1)  Attachment A to the search warrant identifies Johnson as the "target subject" of the warrant by his name, date of birth, and the last four digits of his Social Security Number.  It also describes with a fair degree of precision, exactly how the cell-site simulator will be used and what will be gathered.  More specifically, Attachment A states –

> the Warrant authorizes the Federal Bureau of Investigation and other authorized … law enforcement agencies (hereinafter referred to as "investigative agency(ies)") to use an electronic surveillance technique, that being a cell-site simulator (hereinafter "cell-site simulator") for a period of forty-five (45) days following the issuance of the Warrant i.e., from February 7, 2018, to March 23, 2018, 11:59 p.m. (CT), at all times of day and night, to determine the electronic identifying numbers of any cellular device(s) (hereinafter referred to as "target cellular device(s)") used by the target subject by collecting radio signals, including the unique identifiers, emitted by the target cellular device(s) and other cellular devices in its vicinity, when the investigative agency(ies) have reason to believe that the target subject is present.

(Id. at 2)

The undersigned finds that the cell-site simulator warrant at issue adequately describes the person and place to be searched, namely Johnson and signals emitted from a cell phone(s) that Johnson was using, and the things to be seized as those signals, including unique identifiers.

The warrant was further "particularized" by also describing what was not seized, namely the content of communications (e.g., "telephone calls, text messages, or other electronic communications"). (Id.)  Particularity was further enhanced by placing date restrictions on when the cell-site simulator may be deployed to conduct the search and by requiring that the investigative agencies "make no affirmative investigative use of any identifiers collected from cellular devices other than the target cellular device(s) used by the target subject and distinguish it from the other cellular devices." (Id.)

The Affidavit SFO Betz submitted with his application for the cell-site simulator warrant provides context that is useful to understanding the undersigned's conclusions regarding particularity. (Gov't Exh 2b)[14]  As detailed in the Findings of Fact above, in addition to outlining the investigation and probable cause in general, the Affidavit described how cell phones had been used to further the drug trafficking activities and specifically tied Johnson to the use of cell phones for such activities.  The Affidavit explained in considerable detail how a cell-site simulator would be used to identify cell phones used by Johnson. (See id. at ¶¶ 44-51) Paragraphs 46-48 described the unique identifiers to be seized and how those identifiers would be used to identify Johnson's cell phone(s).

The issuing Magistrate Judge was provided information regarding the terms used in the warrant and the manner and means of execution.  Therefore, terms that might otherwise be unclear in the warrant standing alone have a more particular meaning.  Accordingly, the cell-site simulator warrant was not a general warrant and the officers executing the warrant would have

---

[14] To be clear, the undersigned is not suggesting that the search warrant itself was defective and that the Court can resort to SFO Betz's Affidavit to cure the defect.  See, e.g., United States v. Thomas, 263 F.3d 805, 807-08 (8th Cir. 2001) (explaining that typically particularity is required in the warrant itself, but a defect regarding particularity may be cured by an affidavit if the warrant uses "suitable words of reference to incorporate the affidavit").

necessarily known the limits imposed by the warrant.  See Tutis, 216 F.Supp.3d at 479-80 (rejecting particularity challenge to state-issued cell-site simulator warrant and explaining that the affidavit and warrant provided a "fair characterization" of the cell-site simulator's use and the issuing "judge was not misled and would have no ambiguity about what [that judge] was authorizing").

For the foregoing reasons, the undersigned finds that Johnson's particularity challenge to the cell-site simulator warrant at issue cannot be sustained.  But even if one might conclude that the cell-site warrant was indeed deficient constitutionally in terms of particularity, that deficiency would not provide a basis for suppression in this case.  This is so because the undersigned finds that the cell-site simulator warrant was not so lacking that it would have put a reasonable officer on notice that the warrant might be invalid.  See Szczerba, 897 F.3d at 938.

## C.   Sufficiency of Return for Cell-Site Simulator Warrant

Johnson also argues that the return filed with the cell-site simulator warrant did not comply with Fed. R. Crim. P. 41 and, therefore, he is entitled to suppression.  Johnson argues that the return lacks a proper inventory, and that "[a]bsent such an inventory, a defendant, like Johnson, is left with no way of determining whether law enforcement's search exceeded the scope of the warrant."  (ECF No. 584 at 8)  The government counters that Johnson was not prejudiced by any deficiency because the information he claims he lacked was available to him in discovery.

As noted above, Rule 41 provides for two types of warrants—those directed at searching and seizing a person or property, see Rule 41(f)(1), and those directed at tracking devices, see Rule 41(f)(2).  Unsurprisingly, Rule 41 also requires different types of returns depending on the type of search warrant issued.

31

Warrants directed at searching and seizing persons or property require an officer present at the search to "prepare and verify an inventory of any property seized."  Rule 41(f)(1)(B).  "In a case involving the seizure of electronic storage media or he seizure or copying of electronically stored information, the inventory may be limited to describing the physical storage media that were seized or copied."  Id.  Rule 41(f)(1)(D) requires an officer executing a warrant to make a return to the Magistrate Judge designated on the warrant and that the return is to include a copy of the inventory.

Tracking device warrants, on the other hand, require that the officer "enter on it the exact date and time the device was installed and the period during which it was used."  Rule 41(f)(2)(A).  As for a return of tracking device warrants, Rule 41(f)(2)(B) merely states that a return be made within ten days after the use of the tracking device ends.

Again, the cell-site simulator at issue herein does not fit neatly in the camp of a traditional search warrant and is more akin to a tracking device warrant  For example, the cell-site simulator warrant contemplated execution over a period of time in a manner consistent with tracking device warrants, unlike traditional warrants which are typically executed at a single time.

The return (see Gov't Exh. 2d) in this case complies with the Rule 41 requirements for tracking devices.  The return identifies the date of issuance, the date and time when the investigators first began efforts to identify to the target cellular devices, and the date and time when they stopped identifying the target devices.  Thus, to the extent a cell-site simulator warrant used in this context is akin to a tracking device warrant, the return satisfies Rule 41.

Even if the return for the cell-site simulator warrant is held to a different or higher standard than the standard set for tracking devices, and even if the return failed to comply the

general return requirements under Rule 41, Johnson would not be entitled to suppression for that alleged violation of Rule 41.  "A violation of Rule 41 warrants exclusion only when (1) the violation is of constitutional magnitude; (2) the defendant is prejudiced in that the search would not have taken place or would not have been as intrusive; or (3) there is evidence of an intentional and deliberate or reckless disregard for the rule."  Id. (citing United States v. Freeman, 897 F.2d 346, 350 (8th Cir. 1990)).  See also Nyah, 928 F.3d at 700 ("Except when there is a constitutional infirmity, noncompliance with Rule 41 justifies exclusion of evidence 'only if a defendant is prejudiced or if reckless disregard to proper procedure is evident.") (quoting United States v. Spencer, 439 F.3d 905, 913 (8th Cir. 2006)).

The undersigned finds that there was no constitutional infirmity with the cell-site simulator warrant or the return.  The return complied with the form of return provided with the warrant.  Therefore, there can be no reasonable contention that Det. Betz acted in reckless or willful disregard to proper procedure.  Johnson offers no meaningful prejudice that would require suppression.  The government has provided voluminous discovery in this matter, including discovery relating to cellular telephones used by Johnson and the evidence derived therefrom. The form of return used with the cell-site simulator warrant in this case has not left Johnson unable to prepare a defense to the charges or rebut the evidence against him.

**D.    Pen-Trap Statute**

Johnson's final argument regarding the cell-site simulator warrant is that the government relied on the pen-trap statute to obtain the cell-site simulator warrant and that statute "does not contemplate use of a [cell-site simulator] in such manner."  (ECF No. 584 at 9)

As outlined in the Findings of Fact above, a cell-site simulator arguably gathers data that

would place it in the class of pen-trap devices.[15]   If that is correct, the government must comply with the pen-trap statute in order to lawfully use a cell-site simulator.  In this regard, therefore, the cell-site simulator application and warrant in this case complied with the Fourth Amendment, Rule 41, and the pen-trap statute, see 18 U.S.C. §§ 3122, 3123.

In support of this argument, Johnson relies primarily on cases in which the government did not first obtain a warrant before using a cell-site simulator.[16]   Accordingly, his arguments are not apt.  Johnson is not entitled to suppression on the basis of any pen-trap violation or issue.

### E.    Recommendation – Cell-Site Simulator Warrant

The undersigned respectfully recommends that this Court deny Johnson's motion to suppress evidence obtained pursuant to the cell-site simulator warrant at issue in this matter.

---

[15] Section 3127(3) defines the term "pen register" to mean  –
       a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, provided, however, that such information shall not include the contents of any communication, but such term does not include any device or process used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by such provider or any device or process used by a provider or customer of a wire communication service for cost accounting or other like purposes in the ordinary course of its business[.]

Section 3127(4) defines trap and trace device to mean –
       a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication, provided, however, that such information shall not include the contents of any communication[.]

[16] See In re Application of the United States for an Order Authorizing the Installation and Use of a Pen Register and Trap and Trace Device, 890 F.Supp.2d 747, 752 (S.D. Tx 2012) (denying application for authorization to use a cell-site simulator based on pen register statute "as opposed to seeking a warrant").

IV.     **Discovery Motions**

    A.     **Motion to Compel Access to Victim J.W.'s Computer and to Disclose Cell-Site Simulator Data** (ECF No. 585)

        1.     **J.W.'s Computer**

Johnson initially asked our Court to compel the government to provide him with access to overdose victim J.W.'s computer to look for potentially exculpatory evidence.  At the evidentiary hearing, the parties agreed that this motion was now moot.

        2.     **Cell-Site Simulator Information and Data**

Johnson also maintains that the Court must compel the government to provide access to cell-site simulator records and data.  In his motion to compel as originally filed, Johnson argued that he needs the cell-site simulator information to assess whether information in certain wiretap applications was valid.  In his post-hearing memorandum, Johnson contends that he seeks "the information and data acquired by the Government through its use of the [cell-site simulator] in its investigation of this case because that information is directly relevant and material to preparing Johnson's defense and is, at least potentially, exculpatory."  (ECF No. 743 at 9)  Johnson also seeks information about the cell-site simulator device itself.  (Id.)  Johnson argues that he needs this information to craft a meaningful motion pursuant to Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).  (See id. at 9-10)

Regarding the records of cellular devices identified pursuant to the cell-site simulator warrant, the record before the Court indicates that law enforcement did not maintain records for devices that were not attributed to Johnson.  Thus, Johnson is correct that some records were destroyed.  But when Judge Mensah issued the cell-site simulator warrant, the attachment to the warrant directed that records for persons other than Johnson be deleted.  (See Gov't Exh. 2c)

As for how cell-site simulators work in general, the government represented to the Court

that Special Agent Thiedig, the cell-site simulator operator in this case, testified in another case.[17]  (Tr. at 66-68)  According to the government, a transcript of that testimony was provided to Johnson on June 4, 2019.  The government further represented that the premise of Johnsons' argument for compelling disclosure is that the cell-site simulator somehow did not work or produced an erroneous result. But, according to the government, that premise is necessarily flawed because the cell-site simulator uncovered that Johnson was using target telephone #9, which was the subject of a 30-day wiretap order and that the records from that wiretap demonstrate that Johnson was, in fact using the cellular device.

In his post-hearing brief, Johnson offers the following example of how an alleged lack of information deprives Johnson of potentially exculpatory information:  "if the CSS was deployed at numerous locations … and it failed to capture Johnson's alleged phone number at any location where he was surveilled, that evidence would be facially exculpatory."  (ECF No. 743 at 12)

First, Johnson's notion of what constitutes "facially exculpatory" evidence is flawed.  As will be discussed below relative to Johnson's Due Process / loss of evidence argument, how the investigators obtained Johnson's telephone number is "not probative of [his] factual guilt or innocence."  United States v. LeBeau, 867 F.3d 960, 977 (8th Cir. 2017).  Second, Johnson's example ignores the actual record before the Court, which supports the government's contention that Johnson has been provided sufficient information.  In particular, Johnson was provided discovery indicating that the cell-site simulator warrant in question was, in fact, used to identify target telephone #9 and how Johnson's voice was identified as a user of target telephone #9.  For example, target telephone #9 was the subject of a wiretap application and order previously addressed by the undersigned and is referenced in the government's second disclosure of

---

[17] See United States v. Woodson, 4:16 CR 541 AGF.

arguably suppressible information.  (See ECF No. 268 at 10-11)  Target telephone #9 was included in an application for a wiretap in E.D. Missouri Case No. 4:18 MC 222 CDP.  The application was accompanied by an affidavit of Det. Betz.  Paragraph 56 of Det. Betz's affidavit explained how target telephone #9 was identified using the cell-site simulator warrant issued by Judge Mensah on February 7, 2018.  Specifically, the wiretap affidavit states that "[t]he Cell Site Simulator, which was deployed on February 8, 2018, revealed [that] **target telephone #9**, was at the following locations during the same time when Johnson was present:

- 1264 Grant – 2/8/2018 @ 0712hrs

- Peabody Housing Complex – 2/8/2018 @ 0928hrs

- Intersection of Lexington & Paris – 02/8/2018 @1042hrs"

(Case No. 4:18 MC 222 CDP; ECF No. 5-1 at ¶ 56)  The same affidavit explains how investigators confirmed that Johnson was using target telephone #9 in connection with the drug trafficking conspiracy.  Thus, Johnson has information about where the cell-site simulator was deployed and how it was used to identify a specific phone used by him.

In his post-hearing memorandum, Johnson argues that, he is seeking access to potentially exculpatory information and, at a minimum, he is also entitled to receive sufficient information to determine if evidence is not reliable.  Johnson also argues that, for records that were destroyed, he is entitled to a determination whether the government acted in bad faith in failing to preserve potentially exculpatory information.

To the extent Johnson's motion to compel the disclosure of cell-site simulator records seeks information to assess the accuracy of information included in wiretap applications or other legal process, such a request is clearly out-of-time.  The undersigned set a deadline for filing motions directed at wiretap matters and that deadline has long since passed.  The undersigned is

not persuaded that mere speculation that an inaccuracy might be found provides good cause to allow Johnson to file additional wiretap motions out-of-time.  See Fed. R. Crim. P. 12(c)(3); United States v. Hardison, 859 F.3d 585, 589 n.5 (8th Cir. 2017).  Relatedly, Johnson has not identified how the discovery he has been provided would even suggest that there might be a defect or that he is not able to identify and assess the evidence against him flowing from his alleged use of target telephone #9.

With regard to the intentional deletion of records relating to persons other than Johnson, the undersigned finds that Johnson has not made out a viable failure to preserve evidence claim.

Due Process affords criminal defendants a meaningful opportunity to present a complete defense and requires the government to preserve exculpatory evidence.  This rule is perhaps most famously reflected in Brady v. Maryland, 373 U.S. 83 (1963) which involves exculpatory evidence.  But the government's obligations regarding evidence whose value is unknown or merely "potentially useful" to a defendant are not necessarily as demanding as the obligations imposed by Brady.  See California v. Trombetta, 467 U.S. 479, 485 (1984); Arizona v. Youngblood, 488 U.S. 51, 57 (1988).

The Supreme Court began to tackle the issue of the destruction of potentially useful evidence in Trombetta.  That case involved the destruction of breath samples from an "Intoxilyzer" device used to detect drunk drivers.  See 467 U.S. at 481.  The Court reasoned that, even assuming that the breath samples might be exculpatory relative to the operation of the Intoxilyzer, the defendants had other means of demonstrating their innocence.  As such, the Court held that Due Process did not require law enforcement to preserve breath samples.  See id. at 490.[18]

_____

[18] Breathalyzers and similar devices do not provide a particularly apt comparison to the

In Arizona v. Youngblood, the Court clarified the standard a defendant must satisfy to make out a Due Process violation when the government destroys or fails to preserve evidence the value of which is not certain and only potentially useful to a defendant.  See 488 U.S. at 57-58. The defendant in Youngblood was charged with a child sexual assault and law enforcement failed to preserve semen samples from the victim.  Id. at 52.  The Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."  Id. at 58.  Concluding that the government's conduct was negligent at worst, the Court found no Due Process violation.  Id.

More recently, the Eighth Circuit has explained that "[i]t is well established that the Government may not in good or bad faith suppress evidence favorable to the accused."  United States v. Bugh, 701 F.3d 888, 894 (8th Cir. 2012) (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)).  "'If, however, the evidence is only potentially useful, as opposed to clearly exculpatory, then a criminal defendant must prove bad faith on the part of the police to make out a due process violation.'"  Id. (quoting United States v. Houston, 548 F.3d 1151, 1155 (8th Cir. 2008)). Furthermore, "[t]he burden is on the defendant to demonstrate that the evidence was destroyed in bad faith, … and negligent destruction of evidence is insufficient to establish a due process claim …."  Id. (citations omitted).

There are at least two critical flaws in Johnson's argument regarding the deletion of evidence.  First, he has not shown how any information that was deleted had any potentially exculpatory value.  Second, he cannot show any bad faith on the part of law enforcement.

---

use of a cell-site simulator in this case.  Breathalyzers often provide the primary evidence of guilt for crimes such as driving under the influence.  The cell-site simulator in this case merely identified a cellular device and subsequent court-authorized monitoring of that device provides evidence of guilt.

Regarding potentially exculpatory information, a fairly recent Eighth Circuit case is instructive.  In <u>LeBeau</u>, a defendant argued that the government's failure to preserve hotel surveillance video violated his Due Process rights.  An issue in <u>LeBeau</u> was whether agents used a ruse to gain entry into a hotel room.  <u>Id.</u> at 976-77.  Writing for the Eighth Circuit, Judge Kelly found that the question of how the agents gained entry was "not probative of [the defendant's] factual guilt or innocence.  Accordingly, the video surveillance recordings would have had no apparent exculpatory value …." <u>LeBeau</u>, 867 F.3d at 977.[19]

A similar principle applies to Johnson's case.  How the agents identified Johnson's cellular telephone number(s) is not probative of his guilt or innocence on any pending charge. Thus, the information Johnson seeks has no apparent exculpatory value.

Regarding bad faith, Johnson cannot show that the agents acted in bad faith in deleting records unrelated to him or his devices.  Deleting such information was a requirement written into Judge Mensah's search warrant.

Finally, Johnson also asks the Court to compel the disclosure of related to the specific cell-site simulator used in this case (e.g., the name of the device and calibration records).

Under Fed. R. Crim. P. 16(a)(1)(G), at a "defendant's request, the government must give the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial."  Rules 702, 703, and 705 of the Federal Rules of Evidence concern expert witness testimony.  By its own

---

[19] <u>See</u> <u>also</u> <u>United States v. Paris</u>, -- F.3d --, 2020 WL 1522485 (8th Cir. Mar. 31, 2020) (affirming district court decision denying defendant's motion to dismiss the indictment for destruction of evidence).  In <u>Paris</u>, an agent erased the hard drive of his laptop.  The Eighth Circuit concluded that, even though the agent acted in bad faith, the defendant was not entitled to any relief because his claim that the hard drive might contain exculpatory evidence "consist[ed] of speculation built upon speculation."  <u>Id.</u> at *4.

terms, Rule 16(a)(1)(G) concerns the disclosure of expert testimony at trial, not at an evidentiary hearing.  Cf. United States v. Raddatz, 447 U.S. 667, 679 (1980) ("[T]he process due at a suppression hearing may be less demanding and elaborate than the protections accorded the defendant at trial itself.").   Furthermore, "[c]riminal defendants do not have a general constitutional right to discovery.  See Weatherford v. Bursey, 429 U.S. 545, 559 (1977).  In most circumstances, then, a defendant must point to a statute, rule of criminal procedure, or other entitlement to obtain discovery from the government."  United States v. Johnson, 228 F.3d 920, 924 (8th Cir. 2000); see also Raddatz, 447 U.S. at 679 (supra); Wardius v. Oregon, 412 U.S. 470, 474 (1973) ("[T]he Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded.").

Johnson has not identified a valid legal basis that would entitle him to his requested discovery.   Of course, the government has a duty to disclose material exculpatory and impeachment evidence, see, e.g., Brady v. Maryland, 373 U.S. 83 (1963); United States v. Bagley, 473 U.S. 667 (1985), but Johnson has not identified to this Court how any information regarding the operation of the cell-site simulator in this case would likely lead to exculpatory or impeachment evidence.   Similarly, Johnson does not adequately explain how any of the undifferentiated information he seeks would actually be relevant and material to preparing for his defense, including a Daubert motion.[20]

"When determining whether to order disclosure of information, 'one of the most relevant factors to be weighed by the court … is whether or not the evidence is material to the accused's

---

[20] The undersigned has already recommended that the Court deny Johnson's motion to suppress wiretap evidence, including evidence related to target telephone #9.  (ECF No. 534)  Johnson's motion to compel does not explain how any information concerning a cell-site simulator could reasonably lead to the exclusion at trial of that wiretap evidence.

defense.'" <u>United States v. Hoeffener</u>, 950 F.3d 1037, 1043 (8th Cir. 2020) (quoting <u>United States v. Grisham</u>, 748 F.2d 460, 463 (8th Cir. 1984)).  And "[m]ateriality must be shown by more than mere speculation or conjecture."  <u>Id.</u>  At best Johnson's motion rests on speculation or conjecture that there might be some information that might indicate that the cell-site simulator did not operate (or was not operated) as represented in Det. Betz's Affidavit and the associated warrant authorizing the use of a cell-site simulator to identify Johnson's cellular device(s).  It appears to the undersigned that Johnson is simply fishing for something that may or may not become useful in some undifferentiated way.  Accordingly, he is not entitled to any information in addition to that which has already been provided by the government.

Johnson's motion to compel records and information relative to the cell-site simulator in this case is denied.

### B.   Motion for Expert Disclosures and Motion for Early 404(b) Notice
(ECF Nos. 586, 587)

As explained at the evidentiary hearing, it was made clear that Johnson made his motions for expert and 404(b) disclosure to ensure that any required disclosures were made sufficiently in advance of trial to allow him to prepare.  With that understanding, and in view of the fact that no trial date has been set, the undersigned advised that these motions would be denied without prejudice.

### CONCLUSION

Accordingly,

**IT IS HEREBY RECOMMENDED** that Johnson's Motion to Suppress Statements [ECF No 582] be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Johnson's Motion to Suppress Evidence During Unlawful Search of Residence [ECF No 583] be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Johnson's Motion to Suppress Evidence Obtained Through Use of Cell Site Simulator [ECF No 584] be **DENIED**.

**IT IS HEREBY ORDERED** that Johnson's Motion to Compel [ECF No. 585] is **DENIED**.

**IT IS FURTHER ORDERED** that Johnson's Motion for Expert Disclosure [ECF No. 586] is **DENIED** without prejudice as moot.

**IT IS FURTHER ORDERED** that Johnson's Motion for Early Disclosure of 404(b) Evidence [ECF No. 587] is **DENIED** without prejudice as moot.

Regarding the Johnson's suppression motions, the parties are advised that they have fourteen (14) days in which to file written objections to the foregoing Report and Recommendation unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).  See also 28 U.S.C. § 636(b)(1)(A), Fed. R. Crim. P. 59(a).

Regarding Johnson's discovery motions, pursuant to 28 U.S.C. § 636(b)(1)(A), any party may seek reconsideration of this Order before a District Court Judge upon a showing that the Order is clearly erroneous or contrary to law.  The parties are advised that any written objections to this Order shall be filed within fourteen (14) days after service of this Order.  See 28 U.S.C. § 636(b)(1)(A).  Failure to timely file objections waives a party's right to review.  See Fed. R. Crim. P. 59(a).  Objections must be timely and specific in order to require review by a District Court Judge.

The trial of this matter will be set by the Honorable Catherine D. Perry, Senior United States District Judge, at the conclusion of all pretrial proceedings.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this  14th  day of April, 2020.